No. 25-50879

# United States Court of Appeals
# For the Fifth Circuit

GH America Energy, L.L.C.,

*Plaintiff-Appellant*,

---v.---

Douglas Fohn, in his official capacity as Assistant General Counsel of the Electric Reliability Council of Texas, Inc. ("ERCOT"),

*Defendant-Appellee*

Ken Paxton, Attorney General, State of Texas

*Intervenor Defendant-Appellee*

Pablo Vegas, Chief Executive Officer of the Electric Reliability Council of Texas, Inc.; Paul Foster, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Bill Flores, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Carlos Aguilar, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Linda Capuano, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Julie England, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Robert Flexon, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Peggy Heeg, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; John Swainson, Member of the Board Of Directors of the Electric Reliability Council Of Texas, Inc.; Holly Heinrich, in her official capacity as Legal/Regulatory Counsel Of

i

ERCOT,

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
CASE NO. 1:24-CV-00648-RP

## BRIEF FOR PLAINTIFF-APPELLANT GH AMERICA ENERGY, LLC

Eliyahu Ness
NESS PLLC
3232 McKinney Ave
Suite 500
Dallas, TX 75204
(469) 319-1355
eness@nesslegal.com
*Counsel for Plaintiff-Appellant*

February 23, 2026

ii

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that GH America Energy LLC is privately held and has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

**A. <u>Parties to the action</u>**

**Plaintiff–Appellant:**
GH America Energy LLC ("GHAE").
**Defendants–Appellees (official-capacity defendants):**
Douglas Fohn, Assistant General Counsel of Electric Reliability Council of Texas, Inc. ("ERCOT")

Holly Heinrich, Legal/Regulatory Counsel of ERCOT

Pablo Vegas, Chief Executive Officer of ERCOT

Paul Foster, Member of ERCOT Board of Directors

Bill Flores, Member of ERCOT Board of Directors

Carlos Aguilar, Member of ERCOT Board of Directors

Linda Capuano, Member of ERCOT Board of Directors

Julie England, Member of ERCOT Board of Directors

Robert Flexon, Member of ERCOT Board of Directors

Peggy Heeg, Member of ERCOT Board of Directors

John Swainson, Member of ERCOT Board of Directors

**Intervenor–Defendant–Appellee:**

Texas Attorney General Ken Paxton.

**B. Counsel and law firms who have appeared (or are expected to appear) in the case:**

**Plaintiff–Appellant:**

Eliyahu Ness
NESS PLLC
3232 McKinney Ave
Suite 500
Dallas, TX 75204
(469) 319-1355
eness@nesslegal.com

**Defendants–Appellees:**

Elliot Clark
D. Blake Wilson
Elin Isenhour
Winstead PC
600 W. 5th Street
Ste 900
Austin, TX 78701

David H. Thomson
John D. Ramer
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

**Intervenor–Defendant–Appellee:**

Garrett Mitchell Greene
Monroe David Bryant , Jr
Susanna Dokupil
Jacob Edward Przada
Kathleen Hunker

Mark A. Csoros
Munera Al-Fuhaid
Office of the Texas Attorney General
Special Litigation Division
P.O Box 12548
(MC-009)
Austin, TX 78711-2548

**<u>Other persons, associations, and entities with an interest in the outcome</u>**

Electric Reliability Council of Texas, Inc. ("ERCOT").

Xinjiang Guanghui Industry Investment (Group) Company, Ltd.

GH America Investments Group, Inc.

Brazos Highland Properties, LP

Harvest Texas, LLC

_s/ *Eliyahu Ness*_____
NESS PLLC
3232 McKinney Ave
Suite 500
Dallas, TX 75204
(469) 319-1355
eness@nesslegal.com

*Attorney of record for Plaintiff-Appellant*
*GH America Energy, LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and Fifth Circuit Rule 28.2.3, Appellant respectfully submits that oral argument will assist the Court in resolving this appeal.

This appeal presents important questions concerning whether the Lone Star Infrastructure Protection Act, Tex. Bus. & Comm. Code § 117.01, *et seq*., and Tex. Gov't Code § 2275.0101, *et seq*. ("LSIPA"), as applied to deny interconnection to Texas's electric grid based on foreign ownership and control, is preempted by the federal government's foreign-investment screening and mitigation framework under Section 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565 ("Section 721"), as amended by the Foreign Investment Risk Review Modernization Act of 2018, Pub. L. No. 115-232, div. A, tit. XVII, subtitle A, §§ 1701–1728, 132 Stat. 2173 (2018) ("FIRRMA"). Oral argument will assist the Court in evaluating whether the district court erred by treating the intrastate character of the Texas electric grid as dispositive in the federal-preemption analysis. These issues implicate the proper allocation of authority between state regulation of critical infrastructure and the federal government's exclusive role in foreign affairs and national-security screening of foreign investments. The Court's resolution will have significant implications for foreign investment in the United States and for the continued force and uniformity of the Executive Branch's

national screening and mitigation regime, and the decisional process would be substantially aided by oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS iii

STATEMENT REGARDING ORAL ARGUMENT vi

TABLE OF CONTENTS vii

TABLE OF AUTHORITIES ix

STATEMENT OF JURISDICTION 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW 1

INTRODUCTION 2

STATEMENT OF THE CASE 4

A. BACKGROUND 4

B. PROCEDURAL HISTORY 6

SUMMARY OF ARGUMENT 7

ARGUMENT 8

I. STANDARD OF REVIEW 8

II. CONFLICT PREEMPTION 8

 1.  Obstacle preemption turns on Congress's objectives and the federal scheme's design—not on whether the affected sector of the economy may be deemed "intrastate." 9

 2. The district court's "intrastate ERCOT grid" framing is a category error that collapses Section 721's "interstate commerce" inquiry and artificially narrows federal reach. 11

 3.  LSIPA obstructs Congress's objectives by substituting a categorical, nationality-based ban for the federal regime's case-by-case screening, mitigation, and monitoring. 13

4. The district court overstated the State's "traditional police powers" interest and used it to raise the obstacle-preemption bar beyond what the Supremacy Clause allows. — 15

5. The district court rejected a strawman safe-harbor theory; Appellant's conflict claim challenges state foreign-investment gatekeeping, not immunity from neutral regulation. — 18

6. *Crosby* applies because LSIPA is a foreign-policy-laden statute that deprives the federal government of flexibility; *Crosby* is not limited to sanctions regimes. — 20

7. The district court improperly relied on supposed uncertainty about Section 721 statutory jurisdiction in this case to deny conflict preemption at the pleading stage. — 22

III. FIELD PREEMPTION — 26

1. The district court defined the "field" from Texas's perspective; the correct field is foreign-investment national-security screening and gatekeeping. — 26

2. Congress established a pervasive, Executive-administered foreign-investment regime that demands national uniformity and leaves no room for state foreign-ownership gatekeeping. — 27

3. LSIPA occupies the same field as Section 721/FIRRMA because it functions as state foreign-actor gatekeeping through a categorical nationality-and-control exclusion. — 29

CONCLUSION — 30

CERTIFICATE OF COMPLIANCE — 31

CERTIFICATE OF SERVICE — 32

# TABLE OF AUTHORITIES

**Cases**

Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 427–28 (2003) .......................... passim

Arizona v. United States, 567 U.S. 387, 409 (2012) ........................................ passim

Arizona, 567 U.S. at 409 ..................................................................................21

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007) .....................................9

Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373–74 (2000)............ passim

English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990) .......................................... passim

Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist., 786 F.3d 400, 408 (5th Cir. 2015).......................................................................................................................8

Hines v. Davidowitz, 312 U.S. 52, 67 (1941)................................................... passim

Hines, 312 U.S. at 63–64, 67 .............................................................................21

Hines, 312 U.S. at 66–68 ...................................................................................26

Moon v. City of El Paso, 906 F.3d 352, 357 (5th Cir. 2018) .....................................8

Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1274–75 (11th Cir. 2013)...........................................................................................................15

Waste Mgmt. of La., L.L.C. v. River Birch, Inc., 920 F.3d 958, 963 (5th Cir. 2019)8

Zschernig v. Miller, 389 U.S. 429, 432–35 (1968)................................................16

**Statutes**

28 U.S.C. § 1291 .......................................................................................... - 1 -

28 U.S.C. § 1343 .......................................................................................... - 1 -

28 U.S.C. §§ 2201, et seq.............................................................................. - 1 -

50 U.S.C. § 4565 .......................................................................................... passim

Foreign Investment Risk Review Modernization Act of 2018, Pub. L. No. 115-232, div. A, tit. XVII, subtitle A, §§ 1701–1728, 132 Stat. 2173 (2018) ......................2

Tex. Bus. & Comm. Code § 117.01, et seq.................................................vi, - 1 -

Tex. Gov't Code § 2275.0101, et seq.................................................................vi, - 1 -

**Rules**

31 C.F.R. § 800.508 ...........................................................................................20

Federal Rule of Appellate Procedure 4 ..............................................................- 1 -

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff brought claims arising under the Constitution and laws of the United States, including claims for declaratory and injunctive relief that Texas law is preempted by federal law and violates the United States Constitution. The district court also had jurisdiction pursuant to 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act) and 28 U.S.C. § 1343(a)(3) (civil-rights jurisdiction), and Plaintiff sought relief under 42 U.S.C. § 1983.

The district court entered the Order Granting Defendants' Motion to Dismiss and Dismissing the Second Amended Complaint and the corresponding Final Judgment on September 16, 2025. Appellant GH America Energy, LLC filed its Notice of Appeal on October 16, 2025. This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment disposing of all claims against all parties.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.    Whether the Lone Star Infrastructure Protection Act, Tex. Bus. & Comm. Code § 117.01, *et seq.*, and Tex. Gov't Code § 2275.0101, *et seq.* ("LSIPA"), as applied to deny Appellant's application for interconnection to Texas's electric grid based on foreign ownership and control, is conflict-preempted

because it stands as an obstacle to Congress's purposes and objectives embodied in Section 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565 ("Section 721"), as amended by the Foreign Investment Risk Review Modernization Act of 2018, Pub. L. No. 115-232, div. A, tit. XVII, subtitle A, §§ 1701–1728, 132 Stat. 2173 (2018) ("FIRRMA").

II.    Whether LSIPA is field-preempted because Congress has occupied the field of foreign-investment national-security screening and mitigation through Section 721/FIRRMA's centralized Executive-branch regime, leaving no room for States to impose parallel, categorical, country-based exclusions.

## INTRODUCTION

Texas's Lone Star Infrastructure Protection Act bars entities with specified foreign ownership or control from obtaining "direct or remote access" to "critical infrastructure," including Texas's electric grid. As applied here, LSIPA operates as a categorical foreign-ownership ban on interconnection—regardless of project-specific risk, the existence or scope of federal mitigation or ongoing federal oversight over the foreign-owned or controlled applicant, or the federal government's exclusive role in foreign-investment national-security screening.

Congress assigned that gatekeeping function to the federal government through Section 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565 ("Section 721"), as amended by the Foreign Investment Risk Review

2

Modernization Act of 2018, Pub. L. No. 115-232, div. A, tit. XVII, subtitle A, §§ 1701–1728, 132 Stat. 2173 (2018) ("FIRRMA"), and implementing regulations. Pursuant to that federal regime, Appellant GH America Energy, LLC ("GHAE") and its affiliates are subject to continuing federal mitigation and monitoring by the U.S. Department of Defense, on behalf of CFIUS, under a Letter of Assurance executed in CFIUS Case 15-138, entered into pursuant to CFIUS's power under Section 721/FIRRMA. ROA.655-675 (LOA and First Amendment). Under the LOA, GHAE must provide advance notice and is subject to DoD's objection/non-objection/or risk-mitigation requirements before acquiring or executing any agreements for the operation of any renewable-energy projects in the United States. Tab 5, ROA.953-974 (GHAE's Second Am. Compl., "SAC"), ¶¶ 27–31, 39; Tab 6, ROA.664-665 (LOA).

Despite GHAE's substantial investments in Texas in reliance on its LOA, and on the expectation that it could conduct its renewable energy development business like any other U.S. company, LSIPA overrides the LOA by imposing a state-level rule of categorical exclusion: it bars GHAE from interconnection with the electric grid based solely on the locus of GHAE's ultimate ownership and control, thereby displacing the federal government's case-by-case screening and mitigation architecture and overriding the continuing federal oversight embodied in the LOA. The district court upheld LSIPA by treating the uniquely intrastate

3

character of Texas's electric grid as dispositive and by ignoring the conflict between Texas's categorical exclusion and Congress's centralized, Executive-led screening and mitigation framework. That framing is wrong. LSIPA stands as an obstacle to Congress's design and also intrudes into a field Congress reserved to the federal government. The judgment should be reversed.

## STATEMENT OF THE CASE

### A.    BACKGROUND

#### 1.  Federal foreign-investment screening under Section 721/FIRRMA

Congress assigned national-security screening and mitigation of foreign investment to the Executive Branch through Section 721/FIRRMA and implementing regulations. *See generally* 50 U.S.C. § 4565; 31 C.F.R. pt. 800. Under this regime, CFIUS may review covered transactions implicating national security and may impose binding mitigation and monitoring conditions; where appropriate, the President may suspend or prohibit a transaction. *See* 50 U.S.C. § 4565; 31 C.F.R. pt. 800. The detailed history and operation of this framework, and its application to GHAE and its affiliates, are alleged in the Second Amended Complaint ("SAC"). Tab 5 (SAC), ROA.955–960.

As alleged, in 2015 GHAE's affiliated entities submitted a notice to CFIUS regarding a proposed acquisition of U.S. business assets (CFIUS Case 15-138), resulting in a federal mitigation agreement (the "Letter of Assurance" or "LOA")

accepted by the Department of Defense as the monitoring agency to allow CFIUS to conclude action. Tab 5 (SAC) ¶¶ 27–33. In December 2020, "in order to protect U.S. national security," the Department of Defense, GHAE, and its affiliates, executed a First Amendment expanding the LOA's scope to cover GHAE's planned "expansion into the wind and other renewable energy project market." Tab 6, ROA.664. The First Amendment amended the LOA's definition of "Acquiring Parties" to include GHAE and added additional real-property assets contemplated for renewable-energy development. Tab 6, ROA.664–675.

The LOA, as amended, subjects GHAE to continuing federal mitigation and monitoring by the Department of Defense. For example, the First Amendment requires advance notice at least fifteen days before "executing an agreement with respect to the operation of … any … renewable energy project located within the United States," after which DoD "may provide a written objection, non-objection, or conditional non-objection." Tab 6, ROA.665. The LOA framework also provides continuing federal tools to impose conditions and enforce compliance as part of the mitigation structure. Tab 6 (LOA), ROA.657.

## 2. Texas's LSIPA and ERCOT enforcement

In 2021, Texas enacted the Lone Star Infrastructure Protection Act, Tex. Bus. & Comm. Code § 117.01, et seq., and Tex. Gov't Code § 2275.0101, et seq. ("LSIPA"), which prohibits agreements granting direct or remote access to "critical

infrastructure" (including the Texas electric grid) where the counterparty is owned or controlled by persons affiliated with specified foreign countries, including China. Tab 5 (SAC), ROA.965, ¶ 45. Texas and the public body responsible for managing Texas's electric grid, the Electric Reliability Council of Texas, Inc. ("ERCOT"), implemented LSIPA as a categorical foreign-ownership screen for interconnection requests to the ERCOT-managed grid. *Id.*

When LSIPA took effect, GHAE had multiple ERCOT interconnection requests pending. Tab 5 (SAC), ¶¶ 49-63. ERCOT required LSIPA compliance attestations, and after GHAE disclosed its ownership structure, ERCOT threatened cancellation and later cancelled one interconnection request on LSIPA grounds; GHAE was compelled to sell other projects at a loss as a result of LSIPA enforcement. *Id*. In 2024, ERCOT again denied GHAE's request to pursue a screening study for a solar development project called the "Blue Star Solar" project solely because of LSIPA noncompliance. *Id.*, ¶¶ 58–62.

## B. PROCEDURAL BACKGROUND

GHAE filed this action in the Western District of Texas on June 11, 2024, against several ERCOT board members and officers in their official capacity. The district court permitted intervention by the Texas Attorney General on August 12, 2024. After GHAE filed a First Amended Complaint, the ERCOT Defendants moved to dismiss, the motion was fully briefed, and the court held a hearing on

July 22, 2025. While the motion was pending, GHAE moved for leave to file a Second Amended Complaint.

On September 16, 2025, the district court granted leave to file the Second Amended Complaint and granted the Defendants' motion to dismiss, dismissing the Second Amended Complaint without prejudice and entering final judgment. Tab 3 (Order), ROA.925-952; Tab 4 (Judgment), ROA.976. GHAE filed its Notice of Appeal on October 16, 2025.

## SUMMARY OF ARGUMENT

This Court should reverse because LSIPA is preempted by the federal foreign-investment screening and mitigation regime under Section 721, as amended by FIRRMA.

First, LSIPA is conflict-preempted. Congress chose a centralized, Executive-led framework for national-security screening of foreign investment that relies on individualized review, tailored mitigation, and ongoing monitoring. LSIPA substitutes a different rule of decision: a categorical nationality-and-control-based disqualification from access to critical infrastructure, regardless of project-specific risk or the possibility of mitigation. By hard coding that disqualification, LSIPA stands as an obstacle to Congress's objectives embodied in Section 721/FIRRMA and in the specific LOA in this case which is a direct product of that regime.

Second, LSIPA is field-preempted. The district court defined the field as "intrastate grid access," but the relevant field is foreign-investment national-security screening and gatekeeping—an area requiring national uniformity and Executive discretion. LSIPA occupies that same field by imposing state foreign-ownership gatekeeping rules that Congress reserved to the federal government.

Accordingly, the judgment should be reversed.

## ARGUMENT

### I.   STANDARD OF REVIEW

This Court reviews de novo a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 963 (5th Cir. 2019); *Moon v. City of El Paso*, 906 F.3d 352, 357 (5th Cir. 2018); *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 408 (5th Cir. 2015). Under this standard, the Court independently determines whether the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Waste Mgmt.*, 920 F.3d at 963.

In conducting that review, the Court accepts as true all well-pleaded factual allegations and draws reasonable inferences in the plaintiff's favor, but it does not credit legal conclusions or conclusory allegations. *Waste Mgmt.*, 920 F.3d at 963. The pleading must contain sufficient factual matter to permit a reasonable

inference of liability—more than "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

## II.   CONFLICT PREEMPTION

Conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The district court concluded that Appellant failed to meet a "high threshold" for obstacle preemption and held that LSIPA does not conflict with Congress's foreign-investment screening regime in Section 721/FIRRMA. That holding rests on a series of framing errors. Properly understood, this case is not about whether Texas may regulate grid reliability; it is about whether Texas may impose a categorical foreign-ownership ban that functions as a parallel foreign-investment gatekeeping regime in a domain Congress assigned to the federal government.

1. **Obstacle preemption turns on Congress's objectives and the federal scheme's design—not on whether the affected sector of the economy may be deemed "intrastate."**

The district court reasoned that because CFIUS exercises authority only over a defined set of "covered transactions," LSIPA cannot "impede CFIUS's goals." Tab 3 (Order), ROA.939. But obstacle preemption does not ask whether Congress regulated every conceivable corner of a subject. It asks whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." *English*, 496 U.S. at 79; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The relevant inquiry is therefore whether Congress adopted a particular federal design for foreign-investment screening and mitigation—and whether LSIPA obstructs that design—rather than whether Texas characterizes the affected infrastructure as "intrastate." *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012) (preemption analysis looks to federal purpose and intended effects).

Congress chose a centralized, Executive-led mechanism—Section 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565, as amended by FIRRMA—to assess and mitigate national-security risks arising from foreign investment. That framework is calibrated: it provides for individualized assessment, confidential interagency review, negotiated mitigation and monitoring, and—when warranted—presidential suspension or prohibition of a covered transaction. See 50 U.S.C. § 4565(d)(1), (l)(3)(A); 31 C.F.R. pt. 800. Such calibration is a hallmark of federal regimes operating in foreign-affairs-adjacent domains, where Congress and the Executive must retain flexibility to balance security, economic, and diplomatic interests. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373–74 (2000) (federal scheme's "calibration of force" matters to obstacle analysis).

LSIPA conflicts with that federal design because it replaces federal calibration with a categorical, nationality-based disqualification—foreclosing

federally contemplated outcomes (including conditional clearance and mitigation) and substituting a different rule of decision: a blanket ban. Texas may apply evenhanded operational requirements—engineering standards, reliability rules, cybersecurity measures, and similar neutral regulations—to all market participants, and GHAE claims no exemption from such requirements. But Texas may not create a parallel foreign-investment filter that bars participation based solely on nationality or foreign affiliation. That gatekeeping function is what Congress assigned to the federal government through Section 721/FIRRMA.

**2. The district court's "intrastate ERCOT grid" framing is a category error that collapses Section 721's "interstate commerce" inquiry and artificially narrows federal reach**.

The Order repeatedly treats the intrastate character of the ERCOT grid as dispositive—asserting that "CFIUS does not have jurisdiction over intrastate activities" and that LSIPA "merely controls who may access Texas's grid—an intrastate activity." ROA.940. That is a category error, best illustrated by the District Court's treatment of one of Section 721's jurisdictional "hooks"—the definition of a "United States business" subject to review. Under that definition, a "United States business" is "a person engaged in interstate commerce in the United States." 50 U.S.C. § 4565(a)(13). The District Court emphasized the "interstate" component of this definition to support its conclusion that "CFIUS does not have jurisdiction over intrastate activities." ROA.940.

11

But the premise does not follow. A "United States business" may operate in multiple States and therefore be engaged in interstate commerce, while also engaging in intrastate activity within one or more States. The existence of intrastate activity does not negate interstate commerce; the two routinely coexist. Section 721's definition does not ask whether the sector in which the foreign investor seeks to operate is otherwise federally regulated, or whether the targeted infrastructure crosses state lines. It asks whether the "person" subject to foreign-investment screening is engaged in interstate commerce. 50 U.S.C. § 4565(a)(13). Thus, even if Texas characterizes its grid as intrastate for purposes of utility regulation, that characterization does not resolve whether an entity seeking to interconnect to Texas's intrastate grid—such as a developer, owner, or operator—constitutes a "United States business" under Section 721.

Accepting the district court's framing would also produce an unacceptable structural consequence. Even assuming Texas has taken concrete steps to maintain an intrastate grid, that fact cannot be allowed to define the reach of a federal foreign-investment screening regime that turns on whether the *business* is engaged in interstate commerce and that is designed to operate with national uniformity in matters touching foreign relations and national security. Otherwise, a State could effectively insulate foreign participation in a critical sector from federal screening merely because the relevant infrastructure happens to be intrastate—an outcome

12

Congress did not enact and the Supremacy Clause does not permit. Federal law does not contemplate state-by-state enclaves in a domain requiring national uniformity and a single national voice. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (foreign nations must be able to deal with "one national sovereign, not the 50 separate States"); *Hines*, 312 U.S. at 63–64 (matters with international consequences demand national unity).

### 3. LSIPA obstructs Congress's objectives by substituting a categorical, nationality-based ban for the federal regime's case-by-case screening, mitigation, and monitoring."

Obstacle preemption focuses on Congress's objectives and the method Congress selected to achieve them. *English*, 496 U.S. at 79. Section 721, as amended by FIRRMA, reflects a federal judgment that national-security risks arising from foreign investment should be addressed through a uniform, Executive-led screening and mitigation process—one that preserves discretion to evaluate risks in context, to impose tailored mitigation, and to monitor compliance over time. See 50 U.S.C. § 4565; 31 C.F.R. pt. 800. That design also reflects Congress's broader policy judgments that foreign investment yields substantial economic benefits and that the United States should maintain an open investment policy consistent with national security—judgments that depend on national uniformity and Executive flexibility rather than categorical state-by-state exclusion.

LSIPA obstructs those federal objectives because it substitutes a different rule of decision. Instead of individualized federal assessment and calibrated mitigation, LSIPA hard-codes disqualification based on nationality and control and without any exceptions. As applied here, LSIPA operates to deny access to the Texas electric grid based on foreign ownership or control, regardless of project-specific circumstances, individualized risk, or the possibility of mitigation. In doing so, LSIPA forecloses outcomes the federal regime expressly contemplates: a transaction that presents national security risks may nonetheless proceed subject to conditions; that risks may be mitigated through negotiated commitments; and that ongoing monitoring may address residual risk. *See* 50 U.S.C. § 4565(l)(3)(A); 31 C.F.R. pt. 800. This is the precise "calibration of force" problem identified in *Crosby*: Congress and the Executive selected a flexible mechanism, while the State hardens a categorical disqualification that "undermine[s] the intended purpose and 'natural effect'" of the federal scheme. *Crosby*, 530 U.S. at 373–74; *Hines*, 312 U.S. at 67. A state law that replaces Congress's case-by-case screening architecture with a blanket ban "stands as an obstacle" to Congress's objectives and is conflict-preempted.

The district court attempted to avoid this conclusion by characterizing LSIPA as "narrowly concerned with protecting Texas's intrastate electric grid" and as merely controlling "who may access Texas's grid." Tab 3 (Order), ROA.941.

14

But LSIPA's operative mechanism is not a reliability standard; it is a categorical foreign-ownership exclusion. It does not regulate voltage, dispatch, or engineering requirements. It bars participation based on who owns or controls the entity seeking access.

If Texas may impose a nationality-based ban whenever the regulated object falls within traditional police powers, then any State could fence off segments of the national economy through foreign-ownership exclusions embedded in construction permitting, zoning approvals, business licensing, professional licensing, environmental permitting, right-of-way permits, procurement eligibility, and innumerable other intrastate regulatory gateways. States could thereby exclude foreign investors from whole categories of economic activity simply by denying the approvals needed to operate—producing precisely the patchwork Congress avoided by creating a centralized federal screening regime. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427–28 (2003) (state competence and statutory carveouts do not insulate state law from preemption when it interferes with federal foreign-affairs policy); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274–75 (11th Cir. 2013) (state contracting ban preempted where it upset the "nuances" of a calibrated federal foreign-policy regime). Upholding the district court's ruling would reduce calibrated federal screening and mitigation to advisory guidance, subject to override by any State that chooses categorical

15

exclusion over federal calibration. The Supremacy Clause does not permit that result.

**4. The district court overstated the State's "traditional police powers" interest and used it to raise the obstacle-preemption bar beyond what the Supremacy Clause allows.**

Relying on *American Insurance Ass'n v. Garamendi*, the district court reasoned that because Texas's interest in protecting its intrastate electric grid is "strong," GHAE must show an especially "serious conflict" before LSIPA can be held preempted. Tab 3 (Order), ROA.941. That approach misapplies *Garamendi* and misstates the role of "traditional police powers" in obstacle-preemption analysis.

To begin with, the premise proves too much. Obstacle preemption does not recede whenever a State invokes a traditional subject matter. Even in areas of historic state regulation, state law must yield when it obstructs Congress's objectives. *Hines*, 312 U.S. at 67. And where the state measure operates through nationality-based classifications with more than incidental foreign-affairs implications, the "police power" label cannot insulate it from preemption scrutiny. *Zschernig v. Miller*, 389 U.S. 429, 432–35 (1968) (state law invalid where its operation had more than "incidental" foreign-affairs effects).

Properly read, *Garamendi* cuts in Appellant's favor. California argued that because insurance regulation lies within traditional state competence—reinforced

16

by statutory recognition of state authority—its disclosure regime should be protected from preemption. The Supreme Court rejected that move, holding that a federal statute and savings clause directed to domestic commerce preemption "cannot sensibly be construed to address preemption by executive conduct in foreign affairs," *i.e.*, an entirely different field. *See Garamendi*, 539 U.S. at 427–28. The lesson is that state competence in a traditional field does not authorize state action that interferes with federal foreign-policy and national-security decision-making. That is exactly the problem here: LSIPA is not an engineering or reliability rule governing the electric grid. It is a categorical foreign-actor exclusion imposed in the name of national security—an area where Congress deliberately created a centralized, Executive-led screening and mitigation regime. *See* 50 U.S.C. § 4565; 31 C.F.R. pt. 800.

Texas remains free to regulate grid reliability evenhandedly—through neutral interconnection standards, cybersecurity requirements, and operational rules applicable to all participants. But Texas may not leverage that traditional authority to impose a nationality-based ban that substitutes a State's categorical foreign-investment policy for Congress's calibrated federal scheme. *Crosby*, 530 U.S. at 373–77 (state law preempted where it undermined a "calibration of force" in federal foreign-policy regime); *Arizona*, 567 U.S. at 409 (foreign nations must be able to deal with "one national sovereign, not the 50 separate States"). If states

17

could justify categorical foreign-ownership bans whenever the regulated object falls within a traditional sphere, the national screening regime would fracture into state-by-state enclaves—precisely the kind of patchwork the Supremacy Clause forbids.

Accordingly, the district court erred in elevating Texas's asserted "police power" interest into a heightened obstacle-preemption threshold. The relevant question remains the ordinary one: whether LSIPA stands as an obstacle to Congress's purposes and objectives embodied in Section 721/FIRRMA. *English*, 496 U.S. at 79. It does.

**5. The district court rejected a strawman safe-harbor theory; Appellant's conflict claim challenges state foreign-investment gatekeeping, not immunity from neutral regulation**.

The district court next held that LSIPA does not conflict with the Section 721 "safe harbor," reasoning that safe harbor merely prevents "subsequent suspension or prohibition under section 721" and does not give a party "the right to proceed … without further federal or state regulatory review." Tab 3 (Order), ROA.942. The court further accepted Defendants' "absurd results" hypothetical— that Appellant's position would exempt it from "local building codes" or even "grid regulations." *Id*. That critique addresses a position Appellant does not take.

GHAE does not contend that federal foreign-investment review immunizes it from neutral state regulation. To the contrary, GHAE acknowledges that Texas

18

may apply evenhanded operational requirements—engineering standards, safety codes, permitting rules, and reliability and cybersecurity measures—to all market participants, foreign- and domestic-owned alike. The conflict is different and narrower: LSIPA functions as a foreign-investment gatekeeping rule, imposing a categorical nationality-and-control-based disqualification from accessing the electric grid, which is a necessary component of being a renewable energy developer. That is the very determination Congress assigned to the federal government through Section 721/FIRRMA's centralized screening-and-mitigation framework.

Once the issue is framed correctly, the "building codes" hypothetical collapses. Neutral codes and standards regulate *how* an entity builds or operates. LSIPA regulates *who* may participate at all, based on nationality and control, irrespective of project-specific risk or the possibility of mitigation. In that respect, LSIPA substitutes a state categorical answer for the federal scheme's calibrated set of outcomes—approval, conditional approval, mitigation, and monitoring. See 50 U.S.C. § 4565(l)(3)(A); 31 C.F.R. pt. 800. A state law that forecloses those federal outcomes "stands as an obstacle" to Congress's purposes and objectives. *English*, 496 U.S. at 79; *Crosby*, 530 U.S. at 373–74.

Finally, the safe-harbor provision underscores the point. It reflects Congress's decision to end Section 721 action as to a transaction once the federal

19

process concludes—thereby channeling national-security judgments through the federal mechanism rather than leaving them to be relitigated in ad hoc state fora. See 31 C.F.R. § 800.508(d). Appellant does not ask this Court to convert safe harbor into a general exemption from all regulation; it asks the Court to prevent Texas from overriding the federal foreign-investment screening framework with a categorical nationality-based ban.

6. ***Crosby* applies because LSIPA is a foreign-policy-laden statute that deprives the federal government of flexibility; *Crosby* is not limited to sanctions regimes.**

The district court discounted *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), on the ground that the Massachusetts law there was designed to impose "economic pressure" on Burma, whereas LSIPA purportedly "does not seek to influence any foreign nation, only to secure the electric grid." Tab 3 (Order), ROA.18-19. That is too narrow a reading of *Crosby* and too formal a view of obstacle preemption.

*Crosby*'s core teaching is not confined to statutes labeled "sanctions." It is that where Congress establishes a federal scheme that involves foreign-policy considerations and depends on Executive flexibility and calibrated decision-making, a state law that hard-codes a different outcome is preempted because it "undermine[s] the intended purpose and 'natural effect'" of the federal scheme. *Crosby*, 530 U.S. at 373–74. The obstacle in *Crosby* was not merely that

20

Massachusetts sought to "influence" Burma in the abstract; it was that the state law deprived the federal Executive of bargaining leverage and flexibility that Congress intended the President to possess. *Id.* at 376–77. That same structural problem is present here. Congress created an Executive-led screening and mitigation framework for foreign investment precisely because national security and foreign relations require centralized, discretionary judgment. See 50 U.S.C. § 4565; 31 C.F.R. pt. 800. LSIPA frustrates that design by substituting a categorical, nationality-and-control-based disqualification that forecloses federal outcomes short of exclusion (including mitigation and conditional clearance).

Nor does the district court's focus on LSIPA's asserted "grid security" purpose resolve the obstacle inquiry. Labels do not control. The Supreme Court has repeatedly recognized that state laws adopted within traditional subject areas may still be preempted when their operation intrudes into foreign-policy decision-making or undermines the federal government's ability to speak with one voice. *Arizona*, 567 U.S. at 409 (foreign nations must be able to deal with "one national sovereign, not the 50 separate States"); *Hines*, 312 U.S. at 63–64, 67 (national unity is essential in matters with international consequences, and state "auxiliary" rules may not interfere with the federal system). Even where state law is motivated in part by local concerns, it may be preempted if it creates a state-level foreign

21

policy that conflicts with or obstructs the federal scheme. *Garamendi*, 539 U.S. at 413–15, 427–28.

Accordingly, the district court erred in treating *Crosby* as irrelevant merely because LSIPA is not styled as a sanctions statute. The relevant point is functional: LSIPA obstructs a federally calibrated foreign-investment regime by imposing a categorical state rule of exclusion in a domain where Congress designed the federal government to act with uniformity and flexibility. That is obstacle preemption. *English*, 496 U.S. at 79.

**7. The district court improperly relied on supposed uncertainty about Section 721 statutory jurisdiction in this case to deny conflict preemption at the pleading stage.**

The district court treated purported "uncertainty" about whether the Blue Star Solar project would independently satisfy Section 721's definition of a "covered transaction" as a reason to discount obstacle preemption—reasoning that without a clear statutory hook there is no "actual conflict," and further suggesting that any CFIUS "jurisdiction" arising from the LOA would be "immaterial" because it would be agreement-based rather than statutory. Tab 3 (Order), ROA.943. That reasoning is erroneous. This case was dismissed at the pleadings stage, and the question is whether GHAE plausibly alleged that LSIPA operates as nationality-based foreign-investment gatekeeping that obstructs Congress's Section 721/FIRRMA design. *English*, 496 U.S. at 79. GHAE did so.

22

More importantly, the LOA itself supplies the hook the district court claimed was missing—and it does so as part of the Section 721/FIRRMA regime itself. The LOA was executed in CFIUS Case 15-138 in connection with a covered acquisition of U.S. business assets, and it subjects GHAE and its affiliates to ongoing mitigation obligations and oversight by the Department of Defense as the designated monitoring agency. Tab 5 (SAC) ¶¶ 27–31; Tab 6 (LOA), ROA.653–661. Consistent with the Section 721/FIRRMA mitigation framework, the LOA was later amended to address expansion into renewable energy and additional land holdings, and expanded the definition of "Acquiring Parties" to include GHAE—thereby subjecting GHAE's renewable-project activities to continuing federal notice and objection/non-objection/conditional non-objection and monitoring by the Department of Defense. Tab 5 (SAC) ¶ 39; Tab 6 (First Amendment), ROA.664–675. The First Amendment forms part of the LOA "for all purposes" and is governed by federal law. Tab 6 (First Amendment), ROA.664–675. In other words, the LOA, as amended, is not an "agreement-based" constraint external to Section 721/FIRRMA; it is the mitigation instrument through which CFIUS exercises the authority Congress conferred in Section 721 and its implementing regulations.

That is why GHAE's theory does not depend on identifying a separate, stand-alone covered transaction for the Blue Star Solar project in isolation. Within

23

the existing Section 721 mitigation framework, federal law already provides a tailored, enforceable national-security mechanism that performs the screening-and-control function Texas claims to be exercising through LSIPA. Under the LOA, as amended, the Acquiring Parties—including GHAE—must provide the monitoring agency (Department of Defense) at least 15 days' notice before "executing an agreement with respect to the operation of … any … renewable energy project located within the United States," after which DoD may issue "a written objection, non-objection, or conditional non-objection." Tab 6, ROA.665. The LOA regime provides continuing federal tools to impose conditions and enforce compliance as part of the mitigation structure. Tab 6 (LOA), ROA.657. LSIPA supplants that calibrated federal mechanism with a categorical state ban.

The LOA's structure—arising from an original covered transaction and then extending ongoing federal mitigation and monitoring as a foreign actor expands its investments into new industries and additional acquisitions—reflects the intended operation of Section 721/FIRRMA's calibrated federal scheme. Section 721/FIRRMA empowers the Executive Branch to manage national-security risk through continuing, adaptable mitigation and oversight, not through one-off determinations frozen in time. Against that backdrop, the district court's insistence that GHAE identify a separate, stand-alone "covered transaction" for the Blue Star Solar project—despite the LOA's plain requirement of advance notice and federal

24

objection/non-objection from a national-security perspective—again reflects the court's unduly narrow reading of Section 721/FIRRMA and the role Congress assigned to CFIUS in screening and mitigating foreign-investment risk.

Accordingly, the district court erred in concluding that LSIPA is not conflict preempted. Because LSIPA stands as an obstacle to the accomplishment and execution of Congress's purposes embodied in Section 721/FIRRMA, this Court should reverse the dismissal and hold that LSIPA is conflict-preempted as applied here.

### III.    FIELD PREEMPTION

The Supreme Court has held that, even without an express legislative provision for preemption, "state law must yield to a congressional Act" when "Congress intends federal law to 'occupy the field,' state law in that area is preempted." *Crosby*, 530 U.S. at 372.

**1. The district court defined the "field" from Texas's perspective; the correct field is foreign-investment national-security screening and gatekeeping**.

The district court rejected field preemption by defining the relevant "field" as Texas's regulation of access to its intrastate electric grid and then concluding that Section 721/FIRRMA does not occupy that field. That framing stacks the deck. Field preemption turns on whether Congress has occupied a domain of regulation such that States may not impose their own parallel regime within that

domain—not on whether the State can describe the regulated object as part of a traditional local sphere. *Arizona*, 567 U.S. at 399; *Hines*, 312 U.S. at 66–67.

The proper field here is foreign-actor national-security screening and gatekeeping: the federal government's determination, through a centralized Executive process, of whether foreign-controlled entities may proceed with participation in the U.S. economy where national-security risks may be implicated, and on what conditions. Congress addressed that subject in Section 721/FIRRMA, by entrusting foreign-investment risk assessment and mitigation to an interagency, Executive-led regime designed to operate with national uniformity and discretion. That the investment may relate to a sector that is also regulated by states does not alter the field definition or the preemption analysis. As the Supreme Court has emphasized in analogous contexts, even where States regulate in areas of traditional competence, the "dominant" federal interest can occupy the field and preclude state laws that regulate the same subject in a different way. *Arizona*, 567 U.S. at 399; *Hines*, 312 U.S. at 66–68.

Accordingly, the field-preemption inquiry must be conducted at the right level of generality: not "who may access Texas's grid," but whether a State may impose its own nationality-and-control-based gatekeeping rules for foreign participation in a sector of its economy notwithstanding Congress's creation of a centralized federal screening and mitigation regime

26

**2. Congress established a pervasive, Executive-administered foreign-investment regime that demands national uniformity and leaves no room for state foreign-actor gatekeeping**.

Section 721/FIRRMA reflects Congress's judgment that national-security risks arising from foreign investment must be addressed through a centralized federal process administered by the Executive Branch. The statute and implementing regulations establish a comprehensive screening architecture: interagency review; evaluation of national-security risk factors; the ability to impose binding mitigation and monitoring conditions; and, where necessary, presidential action to suspend or prohibit a covered transaction. *See* 50 U.S.C. § 4565; 31 C.F.R. pt. 800. That federal design is "pervasive" in the sense relevant to field preemption: it entrusts the core gatekeeping decision—whether foreign participation may proceed, and on what conditions—to a single nationally accountable mechanism rather than fifty separate state regimes. *Hines*, 312 U.S. at 66–67 (field preemption where Congress adopts a "single integrated and all-embracing system"); *Arizona*, 567 U.S. at 399 (field preemption where federal interest is dominant and statutory framework is comprehensive).

National uniformity is not incidental here; it is essential. Foreign investment screening necessarily implicates foreign affairs, national security, reciprocity, and international economic relations—domains in which the Constitution requires the Nation to speak with "one voice." *See Arizona*, 567 U.S. at 409 (foreign nations

27

must be able to deal with "one national sovereign, not the 50 separate States");

*Hines*, 312 U.S. at 63–64 (international consequences demand national unity). For

the same reason, the Supreme Court has rejected state efforts to impose "a

different, state system of economic pressure" in a way that interferes with the

federal government's conduct of foreign affairs, even where the State acts within

an area of state competence. *Garamendi*, 539 U.S. at 413–15, 427–28. In short,

Congress's choice of a centralized Executive regime reflects the kind of dominant

federal interest and comprehensive federal control that supports field preemption—

and leaves no room for state laws that impose their own nationality-based

screening and exclusion rules.

### 3. LSIPA occupies the same field as Section 721/FIRRMA because it functions as state foreign-actor gatekeeping through a categorical nationality-and-control exclusion.

As explained above and in the conflict-preemption discussion, LSIPA does

not operate as a neutral reliability or engineering standard; it operates as a

gatekeeping rule that bars participation in a sector of Texas's economy based on

nationality and foreign control. That is regulation of the same subject Congress

addressed in Section 721/FIRRMA—foreign participation in the U.S. economy

where national-security concerns may be implicated—only with a different, state-

imposed rule of decision (categorical exclusion rather than federal screening and

mitigation). Under field-preemption principles, States may not impose "auxiliary"

regimes in a field Congress has occupied. *Hines*, 312 U.S. at 66–67; *Arizona*, 567 U.S. at 399.

Allowing LSIPA to stand would fracture the national screening regime into state-by-state enclaves: even after the federal government determines that risks can be managed through mitigation and monitoring, a State could impose a different foreign-ownership rule and fence off part of the national economy. This is despite a foreign investor's very substantial investments in reliance on CFIUS's assurance, as is the case here. The Supreme Court has rejected such state-by-state interference where federal law requires uniformity and Executive flexibility. *Crosby*, 530 U.S. at 376–77; *Garamendi*, 539 U.S. at 427–28. Because LSIPA functions as state foreign-investment gatekeeping in a field Congress reserved to the federal government, it is field-preempted.

Because Congress occupied the field of foreign-investment national-security screening and gatekeeping through Section 721/FIRRMA and its implementing regulations, Texas may not impose a parallel nationality-and-control-based exclusion regime for access to critical infrastructure. LSIPA is therefore field-preempted as applied here, and the judgment should be reversed

## CONCLUSION

For all the foregoing reasons, this Court should reverse the district court's final judgment dismissing GHAE's Second Amended Complaint and remand with instructions to deny the motion to dismiss.


Dated: February 23, 2026                    Respectfully submitted,


                                            */s/ Eliyahu Ness*
                                            Eliyahu Ness
                                            NESS PLLC
                                            3232 McKinney Ave.
                                            Suite 500
                                            Dallas, TX 75204
                                            (469) 319-1355
                                            eness@nesslegal.com

                                            *Attorney for Plaintiff-Appellant GH America Energy, LLC*

# **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief 6138 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

Dated:  February 23, 2026
        Ft. Lauderdale, Florida            _s/ *Eliyahu Ness*_____

                                            Eliyahu Ness
                                            *Attorney for Plaintiff-Appellant GH*
                                            *America Energy, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on February 23, 2026.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. To the best of my knowledge, there are no parties or counsel of record who are not registered CM/ECF users.

Dated:  February 23, 2026
   Ft. Lauderdale, Florida    _s/ *Eliyahu Ness*_____

   Eliyahu Ness

   *Attorney for Plaintiff-Appellant GH America Energy, LLC*

32