**No. 25-50879**

# In the United States Court of Appeals for the Fifth Circuit

———

GH America Energy, L.L.C.,

*Plaintiff–Appellant,*

v.

Douglas Fohn, in his official capacity as Assistant General Counsel of the Electric Reliability Council of Texas, Inc. ("ERCOT"),

*Defendant–Appellee,*

Ken Paxton, Attorney General, State of Texas,

*Intervenor Defendant–Appellee,*

Pablo Vegas, Chief Executive Officer of the Electric Reliability Council of Texas, Inc.; Paul Foster, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Bill Flores, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Carlos Aguilar, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Linda Capuano, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Julie England, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Robert Flexon, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Peggy Heeg, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; John Swainson, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; Holly Heinrich, in her official capacity as a Legal/Regulatory Counsel of ERCOT,

*Defendants–Appellees.*

———

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLEE ATTORNEY GENERAL KEN PAXTON

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

BETH KLUSMANN
Deputy Solicitor General
Beth.Klusmann@oag.texas.gov

MOHMED I. PATEL
Assistant Attorney General

*Counsel for Attorney General Ken Paxton*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50879

———

GH AMERICA ENERGY, L.L.C.,

*Plaintiff–Appellant,*

v.

DOUGLAS FOHN, in his official capacity as Assistant General Counsel of the Electric Reliability Council of Texas, Inc. ("ERCOT"),

*Defendant–Appellee,*

KEN PAXTON, Attorney General, State of Texas,

*Intervenor Defendant–Appellee,*

PABLO VEGAS, Chief Executive Officer of the Electric Reliability Council of Texas, Inc.; PAUL FOSTER, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; BILL FLORES, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; CARLOS AGUILAR, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; LINDA CAPUANO, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; JULIE ENGLAND, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; ROBERT FLEXON, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; PEGGY HEEG, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; JOHN SWAINSON, Member of the Board of Directors of the Electric Reliability Council of Texas, Inc.; HOLLY HEINRICH, in her official capacity as a Legal/Regulatory Counsel of ERCOT,

*Defendants–Appellees.*

———

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Attorney General Ken Paxton, as a governmental party, need not furnish a certificate of interested persons.

/s/ Beth Klusmann
BETH KLUSMANN
*Counsel for Attorney General Ken Paxton*

i

## STATEMENT REGARDING ORAL ARGUMENT

The analysis in this case is straightforward and should not require oral argument: The federal government has not preempted Texas's ability to secure its intrastate electric grid from potentially hostile foreign actors. The Attorney General, however, would welcome the opportunity to participate in oral argument, if the Court believes argument would be helpful.

# Table of Contents

Page

Certificate of Interested Persons ...................................................................... i

Statement Regarding Oral Argument ................................................................ ii

Table of Authorities ...................................................................................... iv

Statement of Jurisdiction .............................................................................. 1

Issues Presented ........................................................................................... 1

Introduction ................................................................................................. 2

Statement of the Case ................................................................................... 3

    I.   ERCOT and LSIPA ............................................................................ 3

    II.  CFIUS ............................................................................................ 7

    III. Factual Background ......................................................................... 9

    IV. Procedural History .........................................................................11

Summary of the Argument .............................................................................13

Standard of Review ...................................................................................... 14

Argument .................................................................................................... 14

    I.   LSIPA Is Not Conflict Preempted. ...................................................15

        A.  LSIPA is not an obstacle to the purpose of CFIUS review .................16

        B.  GHAE's arguments to the contrary are unavailing. .......................... 20

            1.   GHAE goes beyond the text of section 4565. ........................... 21

            2.   GHAE misreads Supreme Court precedent. ............................. 23

            3.   GHAE undervalues Texas's power to protect its critical infrastructure. ...................................................................... 25

    II.  LSIPA Is Not Field Preempted. ........................................................ 28

Conclusion and Prayer ................................................................................. 33

Certificate of Compliance ............................................................................. 34

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ........................................................................ 24

*Arizona v. United States*,
567 U.S. 387 (2012)................................................................... 24, 28

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*,
461 U.S. 375 (1983) ........................................................................ 27

*Barrosse v. Huntington Ingalls, Inc.*,
70 F.4th 315 (5th Cir. 2023) ...........................................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 14

*California v. Zook*,
336 U.S. 725 (1949) ........................................................................ 28

*Cambric v. City of Corpus Christi*,
170 F.4th 321 (5th Cir. 2026) ........................................................ 14

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011) ................................................................. 16, 31

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ......................................................... 28

*CPS Energy v. ERCOT*,
671 S.W.3d 605 (Tex. 2023)...................................................3, 4, 26

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ....................................................17, 21, 23, 24, 30

*Crystal Clear Special Util. Dist. v. Jackson*,
142 F.4th 351 (5th Cir. 2025) ........................................................ 28

*In re Davis*,
170 F.3d 475 (5th Cir. 1999) ......................................................... 28

*De Canas v. Bica*,
424 U.S. 351 (1976) ........................................................................ 29

*Deanda v. Becerra*,
96 F.4th 750 (5th Cir. 2024) .................................................15, 16, 17

*Egelhoff v. Egelhoff ex rel. Breiner*,
   532 U.S. 141 (2001) ................................................................ 15, 16

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ......................................................................... 30

*Matter of Entrust Energy, Inc.*,
   101 F.4th 369 (5th Cir. 2024) .......................................................... 4

*ERCOT v. Just Energy Tex., LP*,
   57 F.4th 241 (5th Cir. 2023) ............................................................. 4

*Favre v. Sharpe*,
   117 F.4th 342 (5th Cir. 2024) ........................................................ 14

*Ferrer v. Chevron Corp.*,
   484 F.3d 776 (5th Cir. 2007) ......................................................... 14

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) ....................................................................... 28

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*,
   426 S.W.3d 59 (Tex. 2014) ................................................................ 3

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ..........................................................................31

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ......................................................................15, 24

*Jackson v. City of Hearne*,
   959 F.3d 194 (5th Cir. 2020) ......................................................... 14

*Kansas v. Garcia*,
   589 U.S. 191 (2020) .............................................16, 27-28, 29, 31, 32

*Lane County v. Oregon*,
   74 U.S. 71 (1868) ........................................................................... 29

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .........................................................................16

*Merck Sharp & Dohme Corp. v. Albrecht*,
   587 U.S. 299 (2019) ....................................................................... 27

*Nat'l Press Photographers Ass'n v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) .......................................................29, 31

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
  491 U.S. 350 (1989) ................................................................15, 26

*Parker v. Brown*,
  317 U.S. 341 (1943) ................................................................ 26, 29

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd.*,
  53 S.W.3d 310 (Tex. 2001) ...................................................... 3, 4

*Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*,
  691 S.W.3d 448 (Tex. 2024) ................................................... 4, 26

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
  485 U.S. 495 (1988) ..................................................................... 22

*R.J. Reynolds Tobacco Co. v. Durham County*,
  479 U.S. 130 (1986) ......................................................................31

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ..................................................................... 28

*Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
  158 F.4th 1227 (11th Cir. 2025) ................................................ 32

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ................................................... 3, 4

*United States v. Texas*,
  144 F.4th 632 (5th Cir. 2025), *reh'g en banc granted, opinion vacated*,
  150 F.4th 656 (5th Cir. 2025) ................................................... 25

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) .............................................16-17, 21, 22, 26, 29

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ................................................................... 25

*Zyla Life Scis., LLC v. Wells Pharma of Hou., LLC*,
  134 F.4th 326 (5th Cir. 2025) ...................................... 14, 15, 16, 25, 27

**Constitutional Provisions, Statutes, and Regulations:**

U.S. Const.
  art. VI, cl. 2 ...............................................................................14, 22
  amend. X ...................................................................................... 25
16 U.S.C. § 824 ................................................................................ 4

50 U.S.C.

§ 4565.................................................................. 8, 17, 20, 21, 22

§ 4565(a)(4)(A).................................................................17

§ 4565(a)(4)(B) ..........................................................7, 21, 30

§ 4565(a)(4)(B)(i) ............................................................ 18

§ 4565(a)(4)(B)(ii) ........................................................... 18

§ 4565(a)(4)(B)(iii) .......................................................... 18

§ 4565(a)(4)(B)(iv) .......................................................... 18

§ 4565(a)(4)(B)(v) ........................................................... 18

§ 4565(a)(13) ...........................................................7, 18, 21

§ 4565(b)(1)(A) ................................................................ 7

§ 4565(b)(1)(A)(i) ............................................................. 8

§ 4565(b)(1)(C) ........................................................... 7, 30

§ 4565(b)(1)(D) ........................................................... 7, 30

§ 4565(b)(3) .................................................................... 8

§ 4565(d)(1) .................................................................... 8

§ 4565(f)....................................................................... 20

§ 4565(f)(6) .................................................................... 8

§ 4565(i)............................................................... 20, 22, 30

§ 4565(k)(2) ...................................................................19

§ 4565(*l*)(2) .................................................................... 8

§ 4565(*l*)(3)(A)(i) ............................................................. 8

Tex. Bus. & Com. Code

ch. 117 .......................................................................... 5

§ 117.001(2) ................................................................... 6

§ 117.002(a) ................................................................... 6

§ 117.002(a)(2).................................................................6

§ 117.003(a) ................................................................... 6

Tex. Util. Code

§ 39.151 ........................................................................ 3

§ 39.151(d) .................................................................... 3

§ 39.360(b)..................................................................... 7

§ 39.360(e) .................................................................... 7

§ 39.360(j)...................................................................... 7

31 C.F.R.

§ 800.301(e)(7) ......................................................................................19

§ 800.501(c)(1)(ii) ................................................................................... 8

§ 800.508(d) ............................................................................................ 8

§ 800.701(b) ...................................................................................... 8, 22

**Other Authorities:**

Act of May 17, 2023, 88th Leg., R.S. ch. 768,
2023 Tex. Gen. Laws 1979 ..................................................................... 5

Act of May 23, 2023, 88th Leg., R.S., ch. 465,
2023 Tex. Gen. Laws 1133 ..................................................................... 6

Act of May 24, 2021, 87th Leg., R.S. ch. 975,
2021 Tex. Gen. Laws 2535 ..................................................................... 5

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012) ......................... 18

Office of the Director of National Intelligence,
*Annual Threat Assessment of the U.S. Intelligence Community*
(March 2025) ......................................................................................... 5

*Office of Investment Security; Guidance Concerning the National Security
Review Conducted by the Committee on Foreign Investment in the
United States*, 73 Fed. Reg. 74,567 (Dec. 8, 2008) ................................ 8

Tex. Att'y Gen. Op. KP-0388 (2021) ...................................................... 6

William Baude et al.,
Hart & Wechsler's The Federal Courts & the Federal System
(8th ed. 2025) ....................................................................................... 29

## STATEMENT OF JURISDICTION

By bringing federal claims under 42 U.S.C. § 1983, GHAE invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331. ROA.954. The district court entered its final judgment dismissing GHAE's complaint on September 16, 2025, ROA.976, and GHAE timely filed its notice of appeal on October 16, 2025, ROA.977. This Court has jurisdiction over GHAE's appeal of the district court's final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED

In an effort to secure Texas's electric grid, which supplies electricity to the vast majority of the State, the Texas Legislature enacted LSIPA, which prohibits ERCOT from allowing certain companies (those owned by citizens of China, Iran, North Korea, or Russia) to interconnect with Texas's electric grid as power generators, among other things. Separately, Congress has adopted a federal system through which a committee of federal officials (CFIUS) reviews certain foreign investments for national-security concerns. 50 U.S.C. § 4565. The issues presented are:

1. Whether the federal CFIUS regime, which reviews interstate transactions, preempts Texas's authority, through LSIPA, to secure Texas's intrastate electric grid from potentially hostile foreign actors.

2. Whether the federal CFIUS regime occupies the field of foreign-investment screening such that Texas is obligated to allow potentially hostile foreign actors to interconnect with its electric grid.

1

## INTRODUCTION

Securing critical infrastructure from potentially hostile foreign actors involves all levels of government—federal, state, and local. Because a federal committee (CFIUS) reviews *some* foreign-investment transactions for national-security purposes, Plaintiff GHAE now asserts that States are preempted from reviewing *any* transaction involving a foreign company for state-security purposes. But Congress has not precluded States from ensuring the security of their own infrastructure. And Texas is not obligated to allow a Chinese-owned company to interconnect to Texas's electric grid—a grid that covers most of the State, rendering its security of utmost importance to Texas.

GHAE overinflates the federal review provided by Congress through CFIUS. Textually, CFIUS does not have the authority to review GHAE's proposed interconnection with Texas's intrastate grid. And structurally, the CFIUS regime leaves ample room for other government actors to review the activities of foreign companies that may impact the security of critical infrastructure. There is no actual conflict between Texas law (LSIPA) and federal review through CFIUS, no frustration of congressional purpose, and no indication by Congress that it intended to occupy the field. GHAE's arguments to the contrary are unconnected to what Congress actually said.

Texas has a significant interest in maintaining the security of its electric grid and the police power to do so. Congress has not taken that historic power away by subjecting some foreign investments to federal review. The district court correctly rejected GHAE's claim.

## STATEMENT OF THE CASE

### I.   ERCOT and LSIPA

**A.** Texas's electric industry is made up of three principal components: power generation, power transmission, and power distribution. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 312 (Tex. 2001). Power generators own and operate generating facilities, while retail providers distribute electricity to consumers. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 61 (Tex. 2014). Transmitters transport electricity over utility lines, and "Texas's electric utilities have voluntarily interconnected their transmission systems" into a single grid. *Pub. Util Comm'n*, 53 S.W.3d at 312. This single grid "serves the majority of the state." *Id.* ERCOT is the independent system operator charged with operating Texas's wholesale electric market and "ensur[ing] the reliability and adequacy of the regional electrical network," Tex. Util. Code § 39.151, subject to the Public Utility Commission's "complete" oversight and review, *id.* § 39.151(d); *CPS Energy v. ERCOT*, 671 S.W.3d 605, 612 (Tex. 2023).[1]

"In its electrical grid, as in so many things, Texas stands alone." *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016). "While all the other states in the Union have extensive interconnections with neighboring states, . . . Texas is covered by a single isolated grid with limited connections to external power supplies." *Id.* This intrastate structure means that Texas's electric grid is generally exempt from federal

---

[1] As noted in the district court's order, the grid and its governing board are both named ERCOT. ROA.926. This brief will refer to the grid as the electric grid and the board as ERCOT.

regulation. *See* 16 U.S.C. § 824; *Pub. Util. Comm'n*, 53 S.W.3d at 312. As this Court has noted, "[i]t is hard to think of a regulatory system that is more guarded from federal interference" than Texas's. *Matter of Entrust Energy, Inc.*, 101 F.4th 369, 391 (5th Cir. 2024) (citation modified). Texas's regulatory approach—"to isolate its grid from the nation's electricity system"—reflects "a conscious decision to exchange reliability for greater independence from federal regulation." *Id.* Accordingly, "the state retains exclusive control and oversight of the market." *ERCOT v. Just Energy Tex., LP*, 57 F.4th 241, 251 (5th Cir. 2023).

**B.** The security of Texas's electric grid is especially critical, as the grid "covers 75 percent of the state's acreage, carries about 90 percent of its electrical load, and includes more than 52,700 miles of transmission lines, 1,100 generation units, and 26 million electricity customers." *CPS Energy*, 671 S.W.3d at 611. Given its independence and isolation, Texas's electric grid is "uniquely vulnerable to sudden power shortages when power plants in the state unexpectedly close because each power plant provides a larger fraction of the grid's total power than individual power plants" elsewhere in the country. *Texas*, 829 F.3d at 431.

This vulnerability was exemplified during Winter Storm Uri, when the electric grid came within minutes of catastrophic failure that could have left some Texans without power for months. *Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 455 (Tex. 2024). ERCOT and the Legislature have made significant progress since then to ensure that the grid remains reliable no matter the weather. *Id.* at 457 nn.26-27 (citing legislation).

But Mother Nature is not the only threat to Texas's grid. Hostile foreign actors present a security risk to Texas's critical infrastructure. As recognized by all levels of government, China, Iran, North Korea, and Russia have engaged in "acts of aggression towards the United States, human rights abuses, intellectual property theft, . . . critical infrastructure attacks, and ties to other hostile actions performed against the State of Texas and the United States." ROA.355. As explained in the U.S. Intelligence Community's Annual Threat Assessment last year, these four countries "present proximate and enduring threats to the United States." Office of the Director of National Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* 9 (March 2025) (emphasis omitted).[2] Specific to this case, the Assessment identified China as "the most active and persistent cyber threat to U.S. government, private-sector, and critical infrastructure networks." *Id.* at 11 (emphasis omitted).

Accordingly, the Texas Legislature has taken numerous steps in recent years to secure Texas's grid against attacks from these hostile foreign actors. In 2021, the Legislature enacted LSIPA, with the stated goal to protect Texas's critical infrastructure from various foreign threats. ROA.367.[3] LSIPA prohibits a "governmental entity" from "enter[ing] into an agreement" if certain companies "would be granted

---

[2] Available at https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf.

[3] Act of May 24, 2021, 87th Leg., R.S. ch. 975, § 2, 2021 Tex. Gen. Laws 2535, 2535-36. Although LSIPA was originally codified in chapter 113 of the Texas Business and Commerce Code, it has since been recodified at chapter 117. Act of May 17, 2023, 88th Leg., R.S. ch. 768, § 24.001(2), 2023 Tex. Gen. Laws 1979, 2005. This brief refers to chapter 117.

direct or remote access to or control of critical infrastructure in this state," Tex. Bus. & Com. Code § 117.002(a).

A company falls within LSIPA's regulatory ambit if "the company is . . . owned by or the majority of stock or other ownership interest of the company is held or controlled by: (i) individuals who are citizens of China, Iran, North Korea, [or] Russia"; or (ii) "a company or other entity . . . that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, [or] Russia." *Id.* § 117.002(a)(2).[4] And an "electric grid," like the one at issue here, qualifies as "[c]ritical infrastructure" under LSIPA. *Id.* § 117.001(2). As a result, and as the Attorney General has explained, LSIPA prevents covered power generators from interconnecting to Texas's grid: "[B]y granting the generation owner the ability to connect the generator to the transmission system, a generation interconnection agreement gives that company direct or remote access to critical infrastructure." Tex. Att'y Gen. Op. KP-0388 (2021).

Despite LSIPA, the Legislature remained concerned that "all critical grid equipment was not prohibited from having an external connection." ROA.367 (bill analysis noting that, in "today's climate of cyber and physical attacks on electric grids," it was "more important than ever to ensure [that Texas was] taking the necessary steps to protect [its] grid from hostile foreign powers.").[5] So in 2023, it enacted a

---

[4] After consulting with the state public safety director and the federal Homeland Security Council, the Texas Governor may also "designate a country as a threat to critical infrastructure for purposes of this chapter." Tex. Bus. & Com. Code § 117.003(a).

[5] *See* Act of May 23, 2023, 88th Leg., R.S., ch. 465, 2023 Tex. Gen. Laws 1133.

6

law prohibiting ERCOT from registering a business entity as a market participant unless the entity attests that it complies with LSIPA. Tex. Util. Code § 39.360(b). If ERCOT finds "a reasonable suspicion" that a company is covered under LSIPA, it "may immediately suspend or terminate [that] business entity's . . . access to any of [ERCOT's] systems." *Id.* § 39.360(e). At ERCOT's request, "the attorney general may investigate" a foreign company's compliance with LSIPA. *Id.* § 39.360(j).

## II. CFIUS

The Committee on Foreign Investment in the United States ("CFIUS") is an Executive Branch committee tasked with reviewing specific transactions to determine their effect on the national security of the United States. 50 U.S.C. § 4565(b)(1)(A). "[C]overed transactions" subject to CFIUS review include (1) a merger, acquisition, or takeover resulting in foreign control of a U.S. business, (2) the purchase or lease by a foreign person of land in close proximity to a U.S. military installation, (3) investment by a foreign person in an unaffiliated U.S. business that operates critical infrastructure or maintains sensitive personal data of U.S. citizens that could be exploited, (4) a change in rights that a foreign person has in a U.S. business that could result in foreign control of that business, and (5) transactions designed to evade CFIUS scrutiny. *Id.* § 4565(a)(4)(B). A U.S. business is defined as "a person engaged in interstate commerce in the United States." *Id.* § 4565(a)(13).

CFIUS review is typically voluntary, although parties largely comply to avoid possible review in the future. ROA.928; 50 U.S.C. § 4565(b)(1)(C) (stating that parties "may initiate a review"); *see also* 50 U.S.C. § 4565(b)(1)(D) (describing when

7

CFIUS may initiate review). Once it receives notice from the parties, CFIUS reviews the transaction "to determine the effects of the transaction on the national security of the United States." 50 U.S.C. § 4565(b)(1)(A)(i). Among other statutorily pre-scribed factors, CFIUS considers "the potential national security-related effects on United States critical infrastructure, including major energy assets." *Id.* § 4565(f)(6).

CFIUS has several options once it completes review. It may refer the covered transaction to the President, *id.* § 4565(*l*)(2), who has the authority to "suspend or prohibit any covered transaction that threatens to impair the national security of the United States," *id.* § 4565(d)(1). CFIUS may also "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security." *Id.* § 4565(*l*)(3)(A)(i). It may also "conclude[] action" on the transaction. *Id.* § 4565(b)(3). At that time a Treasury Department official will "promptly advise the parties to such a transaction in writing of a determination." 31 C.F.R. § 800.508(d). This action precludes further review by CFIUS, *id.* § 800.701(b), absent a demonstration that false or misleading infor-mation was submitted or that the party has breached its mitigation agreement, *id.* § 800.501(c)(1)(ii). This has been described in federal guidance as a "safe harbor" that protects a covered transaction from "the possibility of subsequent suspension or prohibition under section [4565]." *Office of Investment Security; Guidance Concern-ing the National Security Review Conducted by the Committee on Foreign Investment in the United States*, 73 Fed. Reg. 74,567, 74,569 (Dec. 8, 2008).

## III. Factual Background

According to GHAE's second amended complaint, Xinjiang Guanghui Industry Investment (Group) Company, Ltd., is located in the People's Republic of China and majority owned by a Chinese citizen. ROA.954. In 2015, Xinjiang, along with its oil-and-gas business affiliate GH America Investments Group, Inc. ("GH America"), voluntarily gave notice to CFIUS about a proposed transaction through which Xinjiang and GH America would acquire assets in various U.S. companies. ROA.960.

After reviewing the transaction, CFIUS determined that Xinjiang's proposed transaction posed a national-security risk and required Xinjiang and GH America to enter into a mitigation agreement before CFIUS would conclude action. ROA.961. Xinjiang and GH America submitted a mitigation agreement, titled "Letter of Assurance" (LOA), under which they agreed to give the Department of Defense 15-days' notice before "acquiring any interest in, or executing an agreement with respect to the operation of, an oil or gas well located in the United States, or real property located within the United States for the purpose of oil or gas development." ROA.961. DoD would then have an opportunity to object. ROA.961. Xinjiang also agreed to appoint a security officer to report compliance with the LOA to DoD. ROA.961.

Several years later, Xinjiang and GH America formed GHAE and registered it with the Texas Secretary of State in order to invest in the renewable-energy sector. ROA.962. They also purchased over 130,000 acres of land in Val Verde County, Texas, through various subsidiary corporations. ROA.961-62. Xinjiang, GH

9

America, and GHAE then notified CFIUS about their growing investment portfolio in Texas's renewable-energy market, along with a project they were planning to develop on land about 70 miles away from the Laughlin Air Force Base in Val Verde County. ROA.962. DoD objected to the plan, given the project's close proximity to a U.S. air base. ROA.962-63.

In December 2020, an amended mitigation agreement was executed. ROA.963. Xinjiang, GHAE, and every other relevant subsidiary corporation were now parties to the mitigation agreement. ROA.963. And the agreement's scope was expanded, too: GHAE (and every other party) are now required to notify CFIUS about not just oil-and-gas-related ventures but also wind-energy and other renewable-energy projects. ROA.963. The amended agreement included an express acknowledgement that establishing renewable-energy projects near a military installation might have an impact on national security. ROA.963-64. To protect against that risk, DoD could now deny proposed projects when DoD found an incurable national-security risk. ROA.963.

Once the amended mitigation agreement was executed, GHAE began investing in Texas-based renewable-energy projects. ROA.964. To facilitate its projects, GHAE submitted interconnection requests with ERCOT. ROA.966. When LSIPA was enacted in 2021, ERCOT had three pending interconnection requests from GHAE: Blue Star Solar, Blue Star Wind, and Blue Valley Solar. ROA.966. Thus, ERCOT requested GHAE to attest that these interconnection requests complied with LSIPA, and if any did not, ERCOT explained that a non-compliant request

10

would be cancelled. ROA.967. GHAE responded to ERCOT's request, informing ERCOT that Xinjiang, its Chinese-owned affiliate, was its majority owner. ROA.967.

After reviewing GHAE's response, ERCOT sent a potential cancellation notice to GHAE concerning all three projects because none complied with LSIPA. ROA.967. In response, GHAE sold two of the three non-compliant projects. ROA.967. Six months later, ERCOT informed GHAE that it had cancelled the last non-compliant project (Blue Star Solar). ROA.967-68. Over a year later, attempting to market Blue Star Solar to potential LSIPA-compliant customers, GHAE sought permission from ERCOT to pursue a screening study. ROA.968. ERCOT rejected that request. ROA.968.

## IV. Procedural History

In June 2024, GHAE sued ERCOT and its various officials in their official capacity, including its CEO and many of its board members. ROA.37. As relevant here, GHAE's live complaint asserts a claim of preemption under the Supremacy Clause—specifically, that CFIUS review preempts LSIPA—and seeks injunctive relief. ROA.970-74. Because GHAE's original complaint brought several constitutional challenges to LSIPA, Texas Attorney General Ken Paxton intervened in order to defend the constitutionality of LSIPA. ROA.9, 74-87.[6] The ERCOT officials moved to dismiss. ROA.310-44.

---

[6] GHAE's original complaint included Dormant Commerce Clause and equal-protection claims. ROA.32-34. GHAE voluntarily dropped its claim under the Dormant Commerce Clause. ROA.265-68 (first amended complaint). The district court dismissed GHAE's equal-protection claim, ROA.950-52, and GHAE has not asked this Court to reverse that decision.

Following a hearing, the district court granted the ERCOT officials' motion to dismiss, concluding that LSIPA was neither conflict preempted nor field preempted by the federal scheme underlying CFIUS. ROA.952. As to conflict preemption, the district court reasoned that "because CFIUS has jurisdiction over only a limited set of transactions, LSIPA does not impede CFIUS's goals." ROA.939. And as to field preemption, the district court likewise found that because "CFIUS is merely authorized to conduct a national-security review of certain transactions, during a short time frame, after which the case is either closed . . . or . . . transferred . . . for final action," "nothing in the CFIUS statutes suggests an intent to create a pervasive regulatory scheme" overhauling state law in the area. ROA.946. The district court entered final judgment on September 16, 2025. ROA.976.

GHAE timely appealed to this Court. ROA.977-79.

## Summary of the Argument

LSIPA is neither conflict preempted nor field preempted. The district court's judgment concluding as much should be affirmed.

**I.** LSIPA is not conflict preempted absent a clear congressional mandate found in the text and structure of the relevant federal law. The federal statute authorizing CFIUS does not satisfy that high threshold. CFIUS's limited authority allows it to review specific foreign transactions involving interstate commerce or land purchases near military installations. But GHAE proposes to interconnect with Texas's intrastate electric grid—something not covered by CFIUS review. GHAE's arguments to the contrary stretch CFIUS review beyond the text of the statute and misconstrue Supreme Court precedent about foreign policy. Texas maintains the historic police power to regulate and protect its utilities. Through LSIPA, Texas does just that. Accordingly, LSIPA is not an obstacle to Congress's purposes in CFIUS review, and Texas's law is not conflict preempted.

**II.** GHAE's field-preemption arguments fare even worse. Field preemption is both rare and disfavored. Contrary to GHAE's suggestion, Congress has not provided CFIUS wholesale authority over all foreign-investment screening such that States are not permitted from legislating in that field. Instead, CFIUS's jurisdiction is narrower, extending only to certain transactions implicating national security. Congress has left ample room for States to complement federal review with their own measures intended to secure their infrastructure. LSIPA is not field preempted.

13

## Standard of Review

This Court reviews a district court's grant of a Rule 12(b)(6) motion *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Jackson v. City of Hearne*, 959 F.3d 194, 200 (5th Cir. 2020). "Dismissal is appropriate when the complaint fails to plead 'enough facts to state a claim to relief that is plausible on its face' and to 'raise a right to relief above the speculative level.'" *Cambric v. City of Corpus Christi*, 170 F.4th 321, 324 (5th Cir. 2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). This Court must "affirm a district court's dismissal of a suit for failure to state a claim 'on any basis supported by the record.'" *Favre v. Sharpe*, 117 F.4th 342, 346 (5th Cir. 2024) (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780-81 (5th Cir. 2007)).

## Argument

"All preemption has a constitutional source: the Supremacy Clause." *Zyla Life Scis., LLC v. Wells Pharma of Hou., LLC*, 134 F.4th 326, 328 (5th Cir. 2025). Because "the Laws of the United States" are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, "any state law that contradicts federal law is preempted." *Zyla*, 134 F.4th at 328. But "barring any contradiction, the States retain their sovereign prerogatives to regulate." *Id.* The Supreme Court has established a "preemption taxonomy," first dividing between express and implied preemption. *Id.* Because there is no express statutory preemption, GHAE argues only implied preemption. Implied preemption is further divided into conflict preemption and field preemption, *id.*, both of which GHAE claims are implicated here.

14

To preempt LSIPA, the federal scheme "must clear a high threshold," *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (internal quotation marks omitted)—it must overcome the starting "presumption against pre-emption in areas of traditional state regulation," *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001), such as utility regulation, *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989) (*NOPSI*). GHAE has not cleared that threshold because LSIPA is neither (I) conflict preempted nor (II) field preempted. This Court should therefore affirm the district court's judgment.

## I.    LSIPA Is Not Conflict Preempted.

Conflict preemption comes in two forms: impossibility preemption and obstacle-and-purpose preemption. *Zyla*, 134 F.4th at 329. Only the latter (obstacle-and-purpose preemption) is alleged here. That type of conflict preemption "arises when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 329 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

As the district court correctly concluded, applying LSIPA to bar GHAE from interconnecting with Texas's electric grid does not conflict with the federal scheme authorizing CFIUS. Protecting Texas's *intra*state electric grid does not interfere with CFIUS's review of certain transactions involving *inter*state businesses and land purchases. GHAE's arguments to the contrary lack merit.

15

## A.  LSIPA is not an obstacle to the purpose of CFIUS review.

**1.** Before "a state law [is] conflict preempted, 'a high threshold must be met.'" *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011)). Because the preemption of state law represents "a serious intrusion into state sovereignty," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 488 (1996) (plurality op.), the Court begins with a "presumption against pre-emption," *Egelhoff*, 532 U.S. at 151. Specifically, the "[p]reemption analysis begins with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Deanda*, 96 F.4th at 761 (citation modified).

In performing this analysis, "[c]ourts [do] not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Barrosse*, 70 F.4th at 320 (quoting *Whiting*, 563 U.S. at 607). It is instead GHAE's burden to identify evidence of preemptive purpose in the "text and structure of the federal provision at issue." *Zyla*, 134 F.4th at 329 (citation modified); *see also Kansas v. Garcia*, 589 U.S. 191, 214 (2020) (Thomas, J., concurring) (explaining that textualism should guide preemption analysis). "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). After all, "it is Congress rather than the courts that pre-empts state law." *Barrosse*, 70 F.4th at 320.

Any inquiry, therefore, into whether LSIPA is conflict preempted depends on the federal statutory scheme's "text and structure." *Va. Uranium*, 587 U.S. at 768

16

(lead opinion of Gorsuch, J.); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (courts should "examin[e] the federal statute as a whole and identify[] its purpose and intended effects"). The text and structure of the statute governing CFIUS review demonstrates that Congress conferred authority to CFIUS over a specific set of transactions—not all transactions that may involve foreign companies. *See* 50 U.S.C. § 4565. Accordingly, the federal scheme here does not "clear[ly] and manifest[ly]" preempt LSIPA. *Deanda*, 96 F.4th at 761.

**2.** Beginning with the text, Congress granted CFIUS authority over only specific "covered transaction[s]," 50 U.S.C. § 4565(a)(4)(A), which exclusively include:

1. "Any merger, acquisition, or takeover . . . by or with any foreign person that could result in foreign control of any United States business";

2. "[T]he purchase or lease by . . . a foreign person of private or public real estate that . . . is located in the United States . . . in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security";

3. "Any other investment . . . by a foreign person in any unaffiliated United States business that," among other things, "owns, operates, manufactures, supplies, or services critical infrastructure";

4. "Any change in the rights that a foreign person has with respect to a United States business in which the foreign person has an investment, if," among other things, "that change could result in . . . foreign control of the United States business"; and

5. "Any other transaction, transfer, agreement, or arrangement, the structure of which is designed or intended to evade or circumvent the application of this section, subject to regulations prescribed by the Committee."

*Id.* § 4565(a)(4)(B)(i)-(v). None of these transactions encompasses GHAE's request to interconnect with Texas's electric grid, leaving GHAE without a conflict giving rise to preemption.

*First*, three of the categories of transactions require foreign involvement in a "United States business." *Id.* § 4565(a)(4)(B)(i), (iii), (iv). And Congress defined "United States business" as a "person engaged in *inter*state commerce in the United States." *Id.* § 4565(a)(13) (emphasis added). But Texas's grid, as described above, is an *intra*state business. Thus, CFIUS's statutory authority does not extend to reviewing GHAE's request to interconnect with Texas's intrastate grid.

*Second*, CFIUS may review a foreign person's purchase or lease of real estate when the land is "in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security." *Id.* § 4565(a)(4)(B)(ii). But the transaction barred by LSIPA—interconnection with Texas's electric grid—is not the purchase or lease of real estate. So it does not fall within CFIUS's review under this provision.

*Third*, the federal scheme's catch-all provision vests CFIUS with jurisdiction to review any foreign investment "intended to evade or circumvent" CFIUS review. *Id.* § 4565(a)(4)(B)(v). In other words, CFIUS's authority is structurally confined to cover only what would already constitute a covered transaction. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199-200 (2012) (describing *ejusdem generis* canon). Simply put, the catch-all provision, as the district court explained, "does not substantially expand CFIUS's jurisdiction"; it merely allows CFIUS to exercise jurisdiction over what would constitute a covered

18

transaction but for foreign gamesmanship. ROA.940. And, as explained above, GHAE's proposed interconnection with Texas's electric grid does not otherwise fall within CFIUS's purview.

Because (1) Texas's grid is an intrastate business, (2) GHAE has not proposed a real-estate transaction, and (3) GHAE is not otherwise seeking to evade CFIUS review, GHAE's proposed transaction is not subject to CFIUS's statutory review. LSIPA's prohibition of GHAE's interconnection with Texas's grid is therefore not in conflict with the text of the federal regime.

**3.** Nor is LSIPA's prohibition of GHAE's interconnection at odds with the structure of the federal regime. As just described, CFIUS review is limited to specific categories of transactions, leaving many other transactions involving foreign companies outside the scope of CFIUS review. By way of further example, the district court considered whether GHAE was a greenfield investment. ROA.943. A greenfield investment exists where a foreign investor "incorporate[s] a newly formed subsidiary" and separately "arrang[es] for the financing of and the construction of a plant to make a new product." 31 C.F.R. § 800.301(e)(7). Importantly, a "greenfield investment is not a covered control transaction" for purposes of CFIUS review. *Id.* Thus, many business transactions with foreign companies fall outside the scope of the federal regime, meaning state review is not at odds with the structure of the federal law.

Moreover, CFIUS review is not structured to consider state-specific interests. CFIUS itself is made up entirely of federal officials, 50 U.S.C. § 4565(k)(2), and the list of factors they are to consider is national in nature: national defense, national security, the sale of military goods, and critical infrastructure and technology of the

United States, *id.* § 4565(f). There is no statutory requirement to consider state interests or state security.

Finally, the federal statute itself explains that it does not prohibit further federal review of the transaction:

> No provision of this section shall be construed as altering or affecting any other authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, including the International Emergency Economic Powers Act, or any other authority of the President or the Congress under the Constitution of the United States.

50 U.S.C. § 4565(i). If further federal review is expressly permitted, it would make little sense to construe the statute as implicitly prohibiting any regulation or review by state authorities for security concerns.

Section 4565 allows CFIUS to review a specific set of transactions by foreign companies and persons for their impact on national interests—and even then, other federal review is still possible. Nothing about its structure suggests a congressional intent or purpose to preclude States from also reviewing transactions by foreign entities in order to protect state interests and security. GHAE has failed to identify a preemptive purpose in the "text and structure" of section 4565, and review under LSIPA does not stand as an obstacle to the purpose of the federal regime.

## B.  GHAE's arguments to the contrary are unavailing.

Despite the textual and structural limits of CFIUS review, GHAE nonetheless insists that the district court made "a series of framing errors" in upholding LSIPA as applied here. GHAE Br. 9. But GHAE's arguments go beyond the relevant

statutory language, misread Supreme Court precedent, and undervalue Texas's interests. The Court should reject them.

### 1. GHAE goes beyond the text of section 4565.

GHAE first argues (at 10) that the district court ignored the relevant inquiry, which it claims is not "whether Texas characterizes the affected infrastructure as intrastate," but instead "whether Congress adopted a particular federal design for foreign investment screening and mitigation." But GHAE errs by broadly defining the federal scheme without acknowledging its statutory limits. As explained above, the preemption analysis requires "examining the federal statute as a whole," *Crosby*, 530 U.S. at 373, and preemptive purpose is not found in "some brooding federal interest" but rather in statutory "text and structure," *Va. Uranium*, 587 U.S. at 767-68 (lead opinion of Gorsuch, J.). GHAE simply misunderstands the relevant inquiry, which must yield to the federal scheme's textual limits.

GHAE next argues that the intrastate structure of Texas's electric grid is not determinative of whether it is subject to CFIUS review because *GHAE* is an interstate business. GHAE Br. 12 (asserting that the question is "whether an entity seeking to interconnect to Texas's intrastate grid . . . constitutes a 'United States business'"). That gets section 4565 backwards. Covered transactions include instances in which a foreign company wishes to merge with, acquire, invest in, or control a United States business, 50 U.S.C. § 4565(a)(4)(B), and it is that United States business that must be an interstate business, *id.* § 4565(a)(13). As a result, whether GHAE is an interstate business is not the question. It is instead whether the United States business that GHAE seeks to do business with—Texas's electric grid—is an

interstate business. Because Texas's intrastate electric grid is not, GHAE's desire for interconnection is not a covered transaction under section 4565.

GHAE further contends (at 19-20) that the district court's holding conflicts with the federal scheme's safe-harbor provision, which, according to GHAE, "reflects Congress's decision to end . . . action as to a transaction once the federal process concludes." But the safe-harbor regulation, 31 C.F.R. § 800.701(b), prohibits only CFIUS review. Section 4565 itself makes clear that further federal review under other authority is still permitted. 50 U.S.C. § 4565(i). As the district court correctly held, the safe-harbor provision "merely insulates entities from further CFIUS review—it does not give them the right to proceed with transactions without further federal or state regulatory review." ROA.942.

Finally, GHAE argues (at 22-25) that the statutory language is largely irrelevant because GHAE's interconnection request is covered by the LOA. That misunderstands the preemption analysis, which rests on the constitutional provision that makes "the Laws of the United States," as well as its Constitution and treaties, the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. It does not make mitigation agreements between private, commercial entities and parts of the U.S. government the supreme law. The LOA cannot expand CFIUS's statutorily derived authority or otherwise preempt state law. Instead, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Va. Uranium*, 587 U.S. at 767 (lead opinion of Gorsuch, J.) (quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)). GHAE has not done so.

### 2. GHAE misreads Supreme Court precedent.

GHAE also claims that Supreme Court precedent supports its position. It does not. GHAE begins (at 20) by reading *Crosby* to hold that anytime Congress enacts a federal scheme that gives the President flexibility in foreign-policy matters, any state law that addresses similar matters is preempted. But *Crosby* concerned foreign policy; CFIUS review does not.

The federal law in *Crosby* was designed to pressure the Burmese government into respecting human rights and democracy and gave the President various economic tools to do so: "The President has been given this authority not merely to make a political statement but to achieve a political result." *Crosby*, 530 U.S. at 376. Allowing individual States to impose their own economic sanctions on Burma undermined the President's authority by "making it impossible for him to restrain fully the coercive power of the national economy" if "he believes that the national interest requires sanctions to be lifted, or believes that the promise of lifting sanctions would move the Burmese regime in the democratic direction." *Id.* at 377.

The CFIUS regime, however, is not a foreign-policy measure designed to pressure foreign governments into doing what the United States wants. As demonstrated through its text and structure, CFIUS reviews certain business transactions for national-security concerns. Its purpose is not to set foreign policy. Likewise, through LSIPA, Texas is not attempting to pressure China, Iran, North Korea, and Russia into regime change, respecting human rights, or recognizing democratic values. Texas is attempting to secure its critical infrastructure. *Crosby* does not help GHAE.

23

GHAE also repeatedly invokes (at 13, 17, 21) the Supreme Court's statement in *Arizona v. United States* that "foreign countries . . . must be able to confer and communicate . . . with one national sovereign, not the 50 separate States." 567 U.S. 387, 395 (2012). But the statutes at issue in *Arizona* concerned immigration, "'[o]ne of the most important and delicate of all international relationships.'" *Id.* (alteration in original) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 64 (1941)). Reviewing certain investments and land purchases by foreign companies for national-security concerns is not the type of important and delicate international relationship that requires absolute control by the federal government. LSIPA simply protects what the federal scheme here overlooks: Texas's electric grid. Texas's law supplements the federal regime—it does not interfere with it.

*Crosby*, *Arizona*, and other cases from the Supreme Court on which GHAE relies involve federally dominant domains. *See, e.g.*, *Arizona*, 567 U.S. at 416 (alien registration); *Hines*, 312 U.S. at 62 (same); *Crosby*, 530 U.S. at 366 (economic sanctions against foreign nation); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 423 (2003) (insurance claims by Holocaust victims). And underlying each case was the general interest in protecting the "capacity of the President to speak for the Nation with one voice in dealing with other governments." *Garamendi*, 539 U.S. at 424; *cf.* GHAE Br. 21-22 (arguing LSIPA "creates a state-level foreign policy"). The CFIUS regime, however, is not about international relations, but national security, and LSIPA does not undermine the President's foreign affairs power. *Supra* I.A.

24

### 3. GHAE undervalues Texas's power to protect its critical infrastructure.

Finally, GHAE fails to recognize that the security of critical infrastructure is a team sport. "The Federal Government has limited resources," so "it often welcomes state aid in enforcing shared legal norms." *Zyla*, 134 F.4th at 334. The CFIUS regime and LSIPA have similar, although not identical, goals. But they work together, not against each other. Accepting GHAE's theory that the mere presence of the federal regulation prohibits the States from also regulating to protect their interests "would lead to an absurd conclusion: A host of state legislation—from fraud to ordinary criminal prosecutions—would be preempted." *United States v. Texas*, 144 F.4th 632, 720 (5th Cir. 2025) (Oldham, J., dissenting) (internal quotation marks omitted), *reh'g en banc granted, opinion vacated*, 150 F.4th 656 (5th Cir. 2025). Fortunately, that is not the law.

"[I]n our post-*Wickard* world, the Federal Government has its hands in nearly every facet of human existence." *Zyla*, 134 F.4th at 335. Yet, to ensure that "state sovereignty and principles of federalism" are not cast aside, nothing "prevent[s] the States from regulating everything federal law touches." *Id.* at 334-35. "States retain substantial sovereign authority" under our federalist system. *Wyeth v. Levine*, 555 U.S. 555, 584 (2009) (Thomas, J., concurring in the judgment) (citing U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.")). As a result, the "governments of the states are sovereign within their territory," and nothing in the Constitution "wholly withdraw[s] from the states the

25

authority to regulate . . . matters of local concern, on which Congress has not spoken." *Parker v. Brown*, 317 U.S. 341, 359-60 (1943).

LSIPA reflects that basic feature of our system of government, where even if "Congress might have chosen to regulate the more novel aspects of" a specific area, the States still retain "their traditional function of regulating" whatever falls within their historic police powers. *Va. Uranium*, 587 U.S. at 779 (lead opinion of Gorsuch, J.). That is exactly what LSIPA does: It exercises Texas's police power to protect Texas's electric grid. As the district court held, "LSIPA merely controls who may access Texas's grid—an intrastate activity, in an area of traditional state power." ROA.941. Texas certainly retains that prerogative, and Texas has properly exercised its power.

GHAE argues (at 16) that the district court "overstated the State's 'traditional police powers.'" But it is GHAE that understates Texas's police power here. As the Supreme Court has recognized, "[t]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *NOPSI*, 491 U.S. at 365. And with over "26 million electricity customers" and carrying "about 90 percent of [Texas's] electrical load," *CPS Energy*, 671 S.W.3d at 611, any threat to its electric grid is a risk Texas is unable to accept. *See Luminant*, 691 S.W.3d at 455 (recounting that it could take months to restore power to the State if the grid collapses). As the Legislature found, China has increased its "acts of aggression towards the United States, human rights abuses, intellectual property theft, . . . [and] critical infrastructure attacks . . . against the State of Texas and the United

States." ROA.355. Texas may exercise its police powers to prevent any such devastating attacks on its electric grid.

Even if CFIUS reviewed GHAE's request to interconnect with Texas's electric grid, Texas is not obligated to accept the federal government's assessment on what constitutes a permissible foreign threat to Texas's infrastructure. *Contra* GHAE Br. 19. Texas has not outsourced that responsibility to the federal government, especially not CFIUS, which as explained above, applies metrics that overlook Texas's state-specific interest here. To keep its grid reliable and secure, Texas has chosen to limit who may connect to its grid. That policy decision remains within Texas's sovereign prerogative and historic police power. *See Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).

Finally, GHAE insists (at 18) that were LSIPA upheld, "the national screening regime would fracture into state-by-state enclaves." But "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas*, 589 U.S. at 212; *Zyla*, 134 F.4th at 335. That is why "federal law preempts state law only if the two are in logical contradiction." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 319 (2019) (Thomas, J., concurring). That is also why it is of no moment that LSIPA employs a different method of securing Texas's electric grid (barring interconnections with certain companies) than Congress did through CFIUS (case-by-case screening). GHAE Br. 14. As explained above, LSIPA and the federal scheme do not conflict here. But even if GHAE's argument were indulged, "[t]he mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589

27

U.S. at 211. Just as "the nation may [regulate] for the safety and welfare of interstate commerce," "the State may [regulate] as it has in the present case for the safety and welfare of its inhabitants." *California v. Zook*, 336 U.S. 725, 738 (1949). LSIPA simply reflects that basic federalist policy.

*   *   *

As the district court correctly held, GHAE has not met the high burden required to preempt LSIPA. Principles of federalism "counsel[] a presumption that areas of law traditionally reserved to the states," like utility regulation, "are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Lacking any such congressional purpose here, much less a clear and manifest one, LSIPA is not conflict preempted.

## II.  LSIPA Is Not Field Preempted.

GHAE alternatively argues that by enacting the CFIUS regime, Congress intended to occupy the entire field of foreign-investment review. It did not. Field preemption applies only where Congress has "occupie[d] an entire field," reflecting "a congressional decision to foreclose any state regulation in the area." *Arizona*, 567 U.S. at 401; *Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 364 (5th Cir. 2025). No less than "an unambiguous congressional mandate" suffices to field preempt state law, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963), which is why before inferring field preemption, courts should "hesitate," *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018).

As the district court correctly held, "nothing in the CFIUS statutes suggests an intent to create a pervasive" federal regulatory regime, and so LSIPA is not field preempted. ROA.946. CFIUS, as explained above, wields limited authority, *supra* I.A—and that limited authority certainly does not reflect a congressional desire to exclusively control all foreign-investment screening. None of GHAE's arguments to the contrary have merit.

**A.** "Field preemption of state law is disfavored," *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024), which is why it is so "rare" to find in practice, *Kansas*, 589 U.S. at 208; *see also* William Baude et al., Hart & Wechsler's The Federal Courts & the Federal System 833 (8th ed. 2025) (suggesting "the Court's standards for field preemption have become stricter in recent years"). "Only a demonstration that complete ouster of state power . . . was the clear and manifest purpose of Congress" justifies a finding of field preemption. *De Canas v. Bica*, 424 U.S. 351, 357 (1976) (internal quotation marks omitted).

That makes sense: the States remain sovereign, *Parker*, 317 U.S. at 351, and the preemption of state law represents "a significant federal intrusion into state sovereignty," *Va. Uranium*, 587 U.S. at 773 (lead opinion of Gorsuch, J.). So to curb federal law from ousting States from entire domains—especially those "essential to [their] separate and independent existence," *Lane County v. Oregon*, 74 U.S. 71, 76 (1868)—"[c]ourts should not infer field preemption in areas that have been traditionally occupied by the states," *McCraw*, 90 F.4th at 796 (internal quotation marks omitted).

29

As the Supreme Court has explained, field preemption and conflict preemption "are not rigidly distinct," *Crosby*, 530 U.S. at 372 n.6 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)), and, therefore, much of what counsels against conflict preemption here, *supra* I.A., similarly applies in the field-preemption context, too. The Attorney General highlights three features of the CFIUS regime that demonstrate that it does not occupy the field.

*First*, the CFIUS regime is voluntary. Foreign companies are not obligated to notify CFIUS of covered transactions. *See* 50 U.S.C. § 4565(b)(1)(C). And while CFIUS can sua sponte review transactions on its own, *id.* § 4565(b)(1)(D), it is not obligated to. It would make little sense to occupy the field of national security related to foreign investments with a regime that does not require all such investments to be screened. *Second*, and similarly, CFIUS review is limited to certain covered transactions. *Id.* § 4565(a)(4)(B). Many foreign investments will fall outside the scope of CFIUS review. Congress certainly did not intend to preclude States from reviewing transactions that CFIUS cannot. And *third*, CFIUS review does not even occupy the field in federal law. Rather, Congress specifically preserved the ability for other federal authorities to review the transactions covered by CFIUS. *Id.* § 4565(i). Nothing about the CFIUS regime suggests field preemption.

**B.** GHAE's three arguments to the contrary lack merit.[7]

---

[7] On appeal, GHAE has now abandoned its "dormant foreign affairs preemption" argument. For good reason: As the district court held, no Supreme Court case has applied the doctrine since 1968, and in recent years, the doctrine has been cast aside in the light of the Supreme Court's "more recent, text-first preemption cases, which

First, GHAE argues (at 25, 26) that the district court disregarded the proper regulatory space, which, from GHAE's perspective, is not utility regulation but rather "foreign-actor national-security screening and gatekeeping." But the Supreme Court has never defined a field so abstractly, based on the presence of "some brooding federal interest." *Kansas*, 589 U.S. at 202. "Implied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Whiting*, 563 U.S. at 607 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Indeed, a state's "police powers, including those necessary to safeguard the protection of citizens," cannot be discarded so easily. *McCraw*, 90 F.4th at 796.

Next, GHAE argues (at 27, 28) that Congress has established through CFIUS "a comprehensive screening architecture," one that "leaves no room for state laws that impose their own nationality-based screening and exclusion rules." As explained above, CFIUS review is far from comprehensive. Even so, "[p]re-emption should not be inferred . . . simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986). "And importantly, field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation.'" *McCraw*, 90 F.4th at 796 (quoting *R.J. Reynolds*, 479 U.S. at 149). CFIUS's underlying scheme

---

disclaim a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" ROA.947 (citing *Whiting*, 563 U.S. at 607).

leaves ample space for state-level experimentation, certainly enough to ensure Texas's historic police power in this context is not completely overcome.

Finally, GHAE insists (at 28) that "LSIPA occupies the same field as" CFIUS. That overstates reality. Again, LSIPA and CFIUS review share the same goals—securing the country, States, and people from hostile foreign actors. But neither purports to occupy the field. Each leaves room for the other to operate—as demonstrated by the lack of actual conflict between the two in this case. *See supra* I.A.[8]

\* \* \*

As the district court held, this is not the "rare" case where a plaintiff has overcome the hefty presumption against field preemption. *Kansas*, 589 U.S. at 208; ROA.946. CFIUS's authority does not occupy the entire field of foreign-investment screening. Accordingly, LSIPA is not field preempted.

---

[8] Just last year, this Court's sister circuit rejected the same field-preemption argument GHAE now puts forward. *See Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1262-66 (11th Cir. 2025). This Court should do the same.

## Conclusion and Prayer

For these reasons, this Court should affirm the district court's final judgment and hold that federal law does not preempt LSIPA.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ Beth Klusmann
Beth Klusmann
Deputy Solicitor General
Beth.Klusmann@oag.texas.gov

Mohmed I. Patel
Assistant Attorney General

*Counsel for Attorney General Ken Paxton*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,231 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ Beth Klusmann
BETH KLUSMANN