No. 25-50879

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

GH AMERICA ENERGY, L.L.C.,

*Plaintiff-Appellant*

v.

DOUGLAS FOHN, IN HIS OFFICIAL CAPACITY AS ASSISTANT GENERAL
COUNSEL OF THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.
("ERCOT"),

*Defendant-Appellee*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Intervenor Defendant-Appellee*

PABLO VEGAS, CHIEF EXECUTIVE OFFICER OF THE ELECTRIC
RELIABILITY COUNCIL OF TEXAS, INC.; PAUL FOSTER, MEMBER OF THE
BOARD OF DIRECTORS OF THE ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.; BILL FLORES, MEMBER OF THE BOARD OF DIRECTORS OF
THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.; CARLOS
AGUILAR, MEMBER OF THE BOARD OF DIRECTORS OF THE ELECTRIC
RELIABILITY COUNCIL OF TEXAS, INC.; LINDA CAPUANO, MEMBER OF
THE BOARD OF DIRECTORS OF THE ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.; JULIE ENGLAND, MEMBER OF THE BOARD OF DIRECTORS
OF THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.; ROBERT
FLEXON, MEMBER OF THE BOARD OF DIRECTORS OF THE ELECTRIC
RELIABILITY COUNCIL OF TEXAS, INC.; PEGGY HEEG, MEMBER OF THE
BOARD OF DIRECTORS OF THE ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.; JOHN SWAINSON, MEMBER OF THE BOARD OF DIRECTORS
OF THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.; HOLLY
HEINRICH, IN HER OFFICIAL CAPACITY AS A LEGAL/REGULATORY
COUNSEL OF ERCOT,

*Defendants-Appellees*

---

On Appeal from the United States District Court, for the Western
District of Texas, No. 1:24-cv-00648-RP, Hon. Robert Pitman, Presiding

## Brief of Defendants-Appellees

Elliot Clark
Texas Bar No. 24012428
eclark@winstead.com
Winstead PC
600 W. 5th Street, Suite 900
Austin, Texas 78701
Telephone: (512) 370-2849

John D. Ramer
DC Bar No. 90002236
jramer@cooperkirk.com
David H. Thompson
DC Bar No. 450503
dthompson@cooperkirk.com
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9600

Wallace B. Jefferson
Texas Bar No. 00000019
wjefferson@adjtlaw.com
Nicholas Bacarisse
Texas Bar No. 24073872
nbacarisse@adjtlaw.com
Alexander Dubose &
   Jefferson LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300

### Attorneys for Defendants-Appellees

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following list of persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

| | |
|---|---|
| **Appellant:** | GH America Energy, LLC |
| **Appellant's Trial & Appellate Counsel:** | Eliyahu Ness<br>Neil H. Koslowe<br>NESS, PLLC |
| **Appellees:** | Pablo Vegas<br>Paul Foster<br>Bill Flores<br>Carlos Aguilar<br>Linda Capuano<br>Julie England<br>Robert Flexon<br>Peggy Heeg<br>John Swainson<br>Douglas Fohn<br>Holly Heinrich |

| | |
|---|---|
| **Appellees' Trial & Appellate Counsel:** | Elliot Clark |
| | Elin Isenhower |
| | D. Blake Wilson |
| | WINSTEAD PC |
| | |
| | Wallace B. Jefferson |
| | Rachel Ekery |
| | Nicholas Bacarisse |
| | ALEXANDER DUBOSE & JEFFERSON LLP |
| | |
| | David H. Thompson |
| | John D. Ramer |
| | COOPER & KIRK, PLLC |
| **Defendant-Intervenor/Appellee:** | Kenneth Paxton |
| | TEXAS ATTORNEY GENERAL |
| **Defendant-Intervenor/Appellee's Trial & Appellate Counsel** | Beth Ellen Klusmann |
| | Monroe David Bryant |
| | Mohmed Idris Patel |
| | Susana Dokupil |
| | Munera Al-Fuhaid |
| | OFFICE OF THE TEXAS ATTORNEY GENERAL |
| | |
| | Garrett M. Greene |
| | AMERICA FIRST POLICY INSTITUTE CENTER FOR LITIGATION |

iv

**Other Interested Parties**

Electric Reliability Council of
  Texas, Inc.
Sun Guangxin
Xingjiang Guanghui Industry
  Investment (Group) Co., Ltd.
GH America Investments Group, Inc.
Brazos Highland Properties, LP
Harvest Texas, LLC


*s/ Wallace B. Jefferson*
Wallace B. Jefferson

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not request oral argument. The district court dismissed Appellant's claims based on a careful application of clearly established law. On appeal, Appellant neither confronts this Court's recent precedent governing its preemption claims nor meaningfully attempts to locate a preemptive intent in the text of the federal statute, as that precedent demands. Oral argument thus will not assist this Court in resolving this straightforward appeal.

If this Court sets this case for argument, Appellees will participate to aid the Court's adjudication.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................ iii

STATEMENT REGARDING ORAL ARGUMENT .................................................. vi

TABLE OF AUTHORITIES ......................................................................................... ix

STATEMENT OF ISSUES .............................................................................................1

STATEMENT OF THE CASE ...................................................................................... 2

I.      Factual Background ............................................................................................ 2

        A.      Texas intentionally insulated its electric grid from federal
                regulation. ................................................................................................ 2

        B.      Texas's intrastate grid is operated by ERCOT, which is an
                instrumentality of the State. ................................................................ 3

        C.      Texas enacted the Lone Star Infrastructure Protection Act to
                ensure the reliability and security of the intrastate ERCOT grid. ........ 5

        D.      As required by LSIPA, ERCOT denied GHAE's interconnection
                request. ...................................................................................................... 6

II.     Procedural History ............................................................................................ 9

SUMMARY OF THE ARGUMENT ........................................................................... 12

ARGUMENT ................................................................................................................15

I.      The CFIUS regime is narrow and largely voluntary. ...................................15

II.     The district court correctly dismissed GHAE's obstacle-preemption
        claim. ............................................................................................................... 21

        A.      The conflict requiring preemption must be found in the federal
                statute's *text*. ........................................................................................ 21

        B.      There is no conflict between LSIPA and § 721's text. ....................... 23

        C.      GHAE cannot overcome the heavy presumption against
                preemption. ............................................................................................ 28

        D.      *Crosby* does not support preemption here. ..........................................31

        E.      The Letter of Assurance is irrelevant to the preemption analysis.
                ..................................................................................................................33

III.    GHAE failed to adequately allege field preemption.....................................37

IV.    GHAE's preemption claims suffer from several other fatal defects. ............ 41

    A.    GHAE failed to plead an *Ex Parte Young* cause of action. ................... 42

        1.    Congress foreclosed private enforcement of § 721. .................. 42

        2.    GHAE failed to sue a proper defendant. ..................................... 47

    B.    GHAE failed to adequately plead a § 1983 claim. ............................... 48

        1.    GHAE failed to identify any federal right that could support its § 1983 claim. ............................................................ 48

        2.    GHAE failed to adequately plead a *Monell* claim. ..................... 49

    C.    GHAE lacks standing to sue Ms. Heinrich. ......................................... 52

CONCLUSION ................................................................................................... 54

CERTIFICATE OF SERVICE ............................................................................... 56

CERTIFICATE OF COMPLIANCE ........................................................................ 56

## TABLE OF AUTHORITIES

**Cases**

*AbbVie, Inc. v. Fitch,*
152 F.4th 635 (5th Cir. 2025) ..................................................... 40, 41

*AbbVie, Inc. v. Murrill,*
166 F.4th 528 (5th Cir. 2026) .................................................. 1, 37, 40

*Acorn Iron & Supply Co. v. Bethlehem Steel Co.,*
96 F. Supp. 481 (E.D. Pa. 1951).................................................... 45

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ........................................................... 43, 45

*Alliance v. Alternative Holistic Healing, LLC,*
No. 1:15-cv-349-REB-CBS, 2016 WL 223815 (D. Colo. Jan. 19,
2016) ...................................................................................... 43

*American Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ..................................................................... 30

*Arizona v. United States,*
567 U.S. 387 (2012).................................................................37, 39

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015)................................................... 42, 43, 45, 48

*Arnone v. Dallas County,*
29 F.4th 262 (5th Cir. 2022) ........................................................51

*Chamber of Com. v. Whiting*
563 U.S. 582 (2011) .................................................................... 39

*City of El Cenizo v. Texas,*
890 F.3d 164 (5th Cir. 2018) ...................................................... 38

*Coalition for Competitive Elec. v. Zibelman,*
272 F. Supp.3d 554, 565 (S.D.N.Y. 2017), *aff'd on other grounds,*
906 F.3d 41 (2d Cir. 2018)................................................44, 46, 47

*CPS Energy v. ERCOT*,
   671 S.W.3d 605 (Tex. 2023) ........................................................ 2, 4

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363 (2000) ................................................... 31, 32, 33

*Crown Castle Fiber, LLC v. City of Pasadena*,
   76 F.4th 425 (5th Cir. 2023) .................................................... 44

*Daves v. Dallas County*,
   22 F.4th 522 (5th Cir. 2022) (en banc) ................................... 50

*DeCanas v. Bica*,
   424 U.S. 351 (1976) .................................................................. 39

*Dubbs v. Head Start, Inc.*,
   336 F.3d 1194 (10th Cir. 2003) ............................................... 50

*Egelhoff v. Egelhoff*,
   532 U.S. 141 (2001) .................................................................. 23

*Enders v. Boone*,
   658 F. Supp.3d 70 (N.D.N.Y. 2023)................................... 52, 53

*ERCOT v. Just Energy Tex., L.P. (In re Just Energy Grp., Inc.)*,
   57 F.4th 241 (5th Cir. 2023) ..................................... 2, 12, 18

*Familias Unidas v. Briscoe*,
   619 F.2d 391 (5th Cir. 1980) ............................................. 51, 52

*Ferrer v. Chevron Corp.*,
   484 F.3d 776 (5th Cir. 2007) ................................................... 15

*Freedom From Religion Found., Inc. v. Mack*,
   4 F.4th 306 (5th Cir. 2021), *vacated in part without regard to the
   merits*, 49 F.4th 941 (5th Cir. 2022) .................................. 47, 48

*Garcia Morin v. Bondi*,
   152 F.4th 626 (5th Cir. 2025) .................................................. 42

*Golden State Transit Corp. v. City of Los Angeles*,
   493 U.S. 103 (1989) ............................................................. 48, 49

x

*Great Atl. & Pac. Tea Co. v. Cottrell*,
424 U.S. 366 (1976) ................................................................... 24, 25

*Guillot v. Russell*,
59 F.4th 743 (5th Cir. 2023) .............................................................51

*Hafer v. Melo*,
502 U.S. 21 (1991) ............................................................................ 49

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ..........................................................................1, 39

*Kansas v. Garcia*,
589 U.S. 191 (2020) .............................................. 22, 37, 38, 39

*Kentucky v. Graham*,
473 U.S. 159 (1985) ........................................................................ 49

*La Union del Pueblo Entero v. Abbott*,
151 F.4th 273 (5th Cir. 2025).............................. 21, 22, 23, 28

*Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*,
410 F. Supp.3d 943 (S.D. Ind. 2019).......................................... 44

*Los Angeles County v. Humphries*,
562 U.S. 29 (2010) .......................................................................... 49

*Martinez v. Nueces County*,
71 F.4th 385 (5th Cir. 2023) ........................................................ 50

*Massachusetts Hosp. Ass'n v. Harris*,
500 F. Supp. 1270 (D. Mass. 1980)............................................. 53

*Michalik v. Herman*,
No. 99-3496, 2001 WL 434489 (E.D. La. Apr. 26, 2001) ............................ 52, 54

*Monell v. N.Y.C. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)........................................................................ 49

*New York v. FERC*,
535 U.S. 1 (2002) ............................................................... 2, 12, 24

*NextEra Energy Cap. Holdings, Inc. v. Lake,*
    48 F.4th 306 (5th Cir. 2022) ...................................................... 29

*O'Melveny & Myers v. FDIC,*
    512 U.S. 79 (1994) .................................................................... 26

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) .................................................................. 38

*Pastoriza v. Pub. Serv. Co. of N.H.,*
    No. 24-cv-252, 2025 WL 662935 (D.N.H. Feb. 28, 2025).................. 44

*Phillips v. ERCOT (In re Entrust Energy, Inc.),*
    101 F.4th 369 (5th Cir. 2024) .............................................. 3, 48

*Public Serv. Comm'n of Utah v. United States,*
    356 U.S. 421 (1958) .................................................................. 25

*PUCT v. City Pub. Serv. Bd. of San Antonio,*
    53 S.W.3d 310 (Tex. 2001) ........................................................ 3

*PUCT v. RWE Renewables Ams., LLC,*
    691 S.W.3d 484 (Tex. 2024) ...................................................... 4

*Randall D. Wolcott, M.D., P.A. v. Sebelius,*
    635 F.3d 757 (5th Cir. 2011)..................................................... 15

*Reynolds v. Giuliani,*
    506 F.3d 183 (2d Cir. 2007)...................................................... 50

*Rountree v. Dyson,*
    892 F.3d 681 (5th Cir. 2018)..................................................... 10

*Safe Streets All. v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017).................................................... 43

*Scannell Properties #516, LLC v. City of Edwardsville,*
    No. 24-2604, 2025 WL 1769310 (D. Kan. June 26, 2025).................. 44

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020)............................................................ 45, 46

*Shen v. Commissioner, Fla. Dep't of Agric. & Consumer Servs.*,
 158 F.4th 1227 (11th Cir. 2025) ............................................................ 30

*Smith v. Hickenlooper*,
 164 F. Supp.3d 1286 (D. Colo. 2016) ........................................ 43, 45, 46

*Society of Separationists, Inc. v. Herman*,
 939 F.2d 1207 (5th Cir. 1991) ...............................................................51

*Texas v. EPA*,
 829 F.3d 405 (5th Cir. 2016) ......................................................2, 4, 29

*Thomas v. City of Port Arthur*,
 No. 1:23-cv-282, 2025 WL 904395 (E.D. Tex. Mar. 25, 2025) .......................... 44

*United States v. Texas*,
 144 F.4th 632 (5th Cir. 2025), *rehearing en banc granted*, 150 F.4th
 656 (5th Cir. 2025) ............................................................................ 39

*United States v. Texas*,
 97 F.4th 268 (5th Cir. 2024) ................................................................ 48

*Valle v. City of Houston*,
 613 F.3d 536 (5th Cir. 2010) ................................................................51

*Village of Old Mill Creek v. Star*,
 No. 17-cv-1163, 2017 WL 3008289 (N.D. Ill. July 14, 2017), *aff'd on
 other grounds sub nom.*, *Electric Power Supply Ass'n v. Star*, 904 F.3d
 518 (7th Cir. 2018) ..................................................................... 44, 47

*Virginia Uranium, Inc. v. Warraen*,
 587 U.S. 761 (2019) ................................................................... 22, 37

*Washington v. Baltimore Police Dep't*,
 457 F. Supp.3d 520 (D. Md. 2020) ......................................................... 53

*West Tex. Utils. Co. v. Texas Elec. Serv. Co.*,
 470 F. Supp. 798 (N.D. Tex. 1979)......................................................... 3

*Wyeth v. Levine*,
 555 U.S. 555 (2009).......................................................................... 26

*Zyla Life Sciences, LLC v. Wells Pharma of Hous., LLC,*
　134 F.4th 326 (5th Cir. 2025) ................................................ 22, 23

## Statutes, Rules & Regulations

16 Tex. Admin. Code § 25.361 ................................................ 4

16 U.S.C. § 824 ................................................................ 2, 3, 24

16 U.S.C. § 824*o* ................................................................ 24

42 U.S.C. § 1983 ................................................................ 48

50 U.S.C. § 4552 ................................................................ 45

50 U.S.C. § 4556 ................................................................ 45, 46

50 U.S.C. § 4565 ................................................................ *passim*

Fed. R. Civ. P. 25 ................................................................ 53

Tex. Bus. & Com. Code § 117.001 ................................................ 5

Tex. Bus. & Com. Code § 117.002 ................................................ 5

Tex. Gov't Code § 2275.0101 ................................................ 5

Tex. Gov't Code § 2275.0102 ................................................ 5

Tex. Util. Code § 39.151 ................................................ 4, 5, 9

Tex. Util. Code § 39.360 ................................................ 6

## Other Authorities

31 C.F.R. § 800.301 ................................................ 18

CFIUS, *Annual Report to Congress–CY2024* ................................................ 19, 20

ERCOT Planning Guide § 5 ................................................ 6, 7

ERCOT Planning Guide § 5.2.2 ................................................ 5, 7

ERCOT Planning Guide § 5.2.8 ................................................ 7

ERCOT Planning Guid § 5.3.2.5 ................................................................ 7

ERCOT Planning Guide § 6.8 .................................................................. 7

ERCOT Protocols § 22A .......................................................................... 7

ERCOT Protocols § 3.11.6 ....................................................................... 7

Executive Order 11858 (May 7, 1975) ..................................................16

## STATEMENT OF ISSUES

1.     Is the Lone Star Infrastructure Protection Act, Tex. Bus. & Com. Code § 117.001–.004; Tex. Gov't Code § 2275.0101–.0103, as applied to Appellant's application to interconnect to the wholly intrastate Texas electricity grid, preempted as an obstacle to Congress's purposes and objectives as embodied by *the text and structure* of § 721 of the Defense Production Act of 1950, 50 U.S.C. § 4565, in light of the fact that § 721 contains no language expressing an intent to preempt state utility regulation, an area of traditional state power, and, on the contrary, expresses an intent *not* to regulate *intra*state commerce?

2.     Is LSIPA's application to Appellant's request to interconnect to the Texas grid field-preempted by § 721 of the Defense Production Act of 1950, considering that § 721 expresses no indication that Congress intended a "complete ouster of state power"[1] and, rather than create an "all-embracing"[2] regulatory scheme, provided for a mostly voluntary system for reviewing a narrow class of foreign-investment-related "covered transactions" for national security concerns— a class that does not include interconnections with Texas's intrastate electricity grid?

---

[1] *AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026) (cleaned up).

[2] *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941).

1

**STATEMENT OF THE CASE**

I.    **Factual Background**

A.    **Texas intentionally insulated its electric grid from federal regulation.**

"In its electrical grid, as in so many things, Texas stands alone." *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023) (quoting *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016)). Apart from Texas, the electric grid in every state in the continental United States has "extensive interconnections with neighboring states." *Texas*, 829 F.3d at 431. But nearly "90% of Texas is covered by a single isolated grid with limited" interstate connections, *id.*, making the grid in Texas "the U.S. mainland's only *intra*state electrical grid," *CPS Energy*, 671 S.W.3d at 611. In other words, in Texas—unlike the rest of the U.S. mainland—"electricity is distributed entirely within a single State." *New York v. FERC*, 535 U.S. 1, 7 (2002).

"Utility regulation is one of the most important of the functions traditionally associated with the police power of the States." *ERCOT v. Just Energy Tex., L.P. (In re Just Energy Grp., Inc.)*, 57 F.4th 241, 251 (5th Cir. 2023) (cleaned up). But because the electric grids in most of the United States cross state lines, most states have ceded substantial regulatory control to the federal government. *See* Federal Power Act §§ 201(a)–(b),[3] 16 U.S.C. §§ 824(a)–(b). With great intention, Texas has

---

[3] The FPA is codified at 16 U.S.C. §§ 824–824w.

2

charted a different course. Its grid's "isolat[ion]" reflects a "conscious decision" by generations of Texas policymakers to ensure "independence from federal regulation." *Phillips v. ERCOT (In re Entrust Energy, Inc.*), 101 F.4th 369, 391 (5th Cir. 2024); *see West Tex. Utils. Co. v. Texas Elec. Serv. Co.*, 470 F. Supp. 798, 807–11 (N.D. Tex. 1979) (discussing the history of the State's intentional decision to avoid federal regulation of what is now the ERCOT grid).

This has allowed Texas to retain uniquely pervasive sovereignty over this area of traditional state control. *Entrust*, 101 F.4th at 378–79, 390–91. The Texas grid is thus generally exempt from federal regulation and the jurisdiction of the Federal Electric Regulatory Commission. *PUCT v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001) ("[B]ecause ERCOT is a wholly intrastate power grid, the federal scheme that [FERC] administers does not generally govern ERCOT."); *see also* 16 U.S.C. §§ 824(a), (b)(1) (providing that FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used . . . only for the transmission of electric energy in intrastate commerce").

### B.    Texas's intrastate grid is operated by ERCOT, which is an instrumentality of the State.

Electricity in Texas has been unbundled, meaning that (with a few exceptions not relevant here), energy is generated, transmitted and/or distributed, and sold for

3

retail use by distinct entities. *Texas*, 829 F.3d at 432. Texas chose ERCOT to regulate the State's grid and the wholesale electricity market, subject to plenary control by the Public Utility Commission of Texas. *See* Texas Public Utility Regulatory Act ("PURA"), Tex. Util. Code §§ 39.151(a), (g); 16 Tex. Admin. Code § 25.361(b); *see CPS Energy*, 671 S.W.3d at 611–12 (discussing ERCOT's history and modern role).

ERCOT is an instrumentality of the State of Texas. *CPS Energy*, 671 S.W.3d at 627 (holding that the Texas Legislature vested ERCOT "with the nature, purposes, and powers of an arm of the State government" (cleaned up)). It manages the grid and wholesale market using statutory rulemaking authority delegated to it by the PUCT. *Id.* at 616–17, 623–24; PURA §§ 39.151(d), (i), (j), (*l*). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State selects ERCOT's governing board. *CPS Energy*, 671 S.W.3d at 623–26. As the Supreme Court of Texas recently observed, "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purpose." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 490 (Tex. 2024).

The term ERCOT can be used to refer to both ERCOT the entity and the grid it manages. For clarity, Appellees will refer to the latter as the "ERCOT grid."

4

**C.    Texas enacted the Lone Star Infrastructure Protection Act to ensure the reliability and security of the intrastate ERCOT grid.**

In June 2021, the Texas Legislature enacted the Lone Star Infrastructure Protection Act ("LSIPA" or the "Act") to defend critical infrastructure in Texas from control or attack by hostile nations. Relevant here, LSIPA prohibits a business or governmental entity from entering into an agreement with a company that is majority owned or controlled by a citizen of China or the Chinese government, or is headquartered in China, if the agreement would give that company "direct or remote access to or control of critical infrastructure in this state." Tex. Bus. & Com. Code § 117.002; Tex. Gov't Code § 2275.0102. "Critical infrastructure" includes the ERCOT grid. Tex. Bus. & Com. Code § 117.001; Tex. Gov't Code § 2275.0101(2). In April 2022, ERCOT revised its Planning Guide—which has the force of state law—to comply with LSIPA. ROA.968-69; ERCOT Planning Guide § 5.2.2(c)–(d);[4] *see* PURA §§ 39.151(d), (j).

In 2023, the Legislature recognized a need to further "protect [against] attacks on the electric grid" and "harden[] the security of the Texas power grid . . . to prevent exposure from attacks on the electric grid." ROA.558. It thus specifically commanded ERCOT not to register, or maintain the registration of, a business entity

---

[4] The ERCOT Planning Guide that was current at the time GHAE filed its live pleading is available at https://perma.cc/WYR7-H933.

as a market participant "unless the business entity attests that [it] complies with" LSIPA. PURA § 39.360(b).

### D. As required by LSIPA, ERCOT denied GHAE's interconnection request.

Appellant GHAE is a Texas LLC operating exclusively in Texas. ROA.954. It is a subsidiary of Xinjiang Guanghui Industry Investment (Group) Company, Ltd., which is headquartered in China and majority owned by Sun Guangxin—a billionaire Chinese citizen who is neither a citizen nor resident of the United States. *Id.* This case concerns ERCOT's denial, pursuant to LSIPA, of GHAE's request to interconnect a proposed solar-energy project, known as the Blue Star Solar Project, to the Texas grid. ROA.966; GHAE's Br. 1.

Before a proposed generation resource may connect to the ERCOT Transmission Grid,[5] it must comply with ERCOT's Generator Interconnection or Modification ("GIM") process. *See* ERCOT Planning Guide § 5. This process requires the Interconnecting Entity to submit information and documentation, undertake studies of the project's effect on the Transmission Grid, and successfully

---

[5] Any capitalized terms not defined herein have the meaning ascribed to them under § 2.1 of the ERCOT Protocols. ERCOT's current Protocols are available at https://ercot.om/mktrules/nprotocols/current. The Protocols in effect at the time that ERCOT canceled the Blue Star Solar Project's interconnection application are available at https://perma.cc/N8SN-WTT5.

complete performance testing. ERCOT Planning Guide § 5; *see also* ERCOT Protocols § 3.11.6. The required documentation includes executing a Standard Form Market Participant Agreement with ERCOT and an Interconnection Agreement with the Transmission and Distribution Service Provider that would serve the project, as well as submitting an attestation that the project complies with LSIPA. ERCOT Planning Guide §§ 5.2.2(2)–(3), 5.3.2.5(7), 6.8(1); *see also id.* § 5.2.2; *id.* § 5.2.8 (form Interconnection Agreement); ERCOT Protocols § 22A (Standard Form Market Participant Agreement).

While this appeal concerns only GHAE's Blue Star Solar Project, the record does not reflect—because GHAE failed to plead—any facts regarding that project's status at the time of the facts giving rise to this case.[6] All that GHAE pleaded was that it had an interconnection application for this project pending at the time LSIPA took effect. ROA.966; *see* GHAE's Br. 6. As part of the post-LSIPA GIM process, GHAE informed ERCOT that it was majority owned by Xinjiang. ROA.967; *see* ROA.564-65 (GHAE's attestation).

---

[6] This is in sharp contrast to GHAE's substantial allegations about its investments in the Blue Star Wind and Blue Valley Solar Projects. *See* ROA.961-64. GHAE also had interconnection applications pending for these projects at the time LSIPA was enacted, *see id.*, but it voluntarily sold the projects and abandoned its claims regarding them, *see infra* § II. Those projects are consequently not relevant to this appeal.

GHAE alleges that in October 2022, Appellee Douglas Fohn—ERCOT's Assistant General Counsel—notified GHAE that ERCOT had canceled the Blue Star Solar Project because of GHAE's noncompliance with LSIPA. ROA.967; *see* ROA.603-04. GHAE alleges that this cancelation was approved by ERCOT's CEO, Appellee Pablo Vegas, and the ERCOT Board Member Appellees. *Id.*

Eighteen months later, GHAE asked ERCOT whether GHAE could "pursue a screening study" for the Blue Star Solar Project to determine whether the land it leased in Val Verde County was "interconnectable and saleable to potential customers who would be in compliance with" LSIPA. ROA.968; *see* ROA.603 (GHAE's email to ERCOT). GHAE alleges that Holly Heinrich—then Legal/Regulatory Counsel for ERCOT—"responded that ERCOT would not permit GHAE to pursue a screening study . . . solely because GHAE did not comply with LSIPA." *Id.* GHAE again alleges that this decision was "authorized and approved" by Mr. Vegas and the ERCOT Board Members. ROA.969; *see* ROA.602 (Ms. Heinrich's email to GHAE).

GHAE alleges that but for LSIPA, it would "immediately submit one or more interconnection requests to ERCOT for utility-scale solar and wind energy projects to be constructed on land" it leases in Val Verde County. ROA.969.

8

## II.    Procedural History

In June 2024, GHAE sued ERCOT, its CEO, and each of its board members. ROA.16-17. Three of the board members served on ERCOT's board solely by virtue of their position as officers of other Texas agencies. ROA.114-15.[7] GHAE asserted three causes of action, claiming that LSIPA was preempted by various federal statutes and was unconstitutional under the Dormant Commerce and Equal Protection Clauses of the United States Constitution. ROA.16-35. GHAE sought injunctive and declaratory relief, as well as damages. ROA.35.

Defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6). ROA.104. In response, GHAE amended its complaint to voluntarily dismiss all its claims against ERCOT the entity and the State Officer Defendants.[8] ROA.249-69. GHAE also voluntarily dismissed its Dormant Commerce Clause claim. *Id.* At the same time, GHAE added official-capacity claims against Douglas Fohn, an in-house ERCOT lawyer; and Holly Heinrich, a former ERCOT in-house lawyer who, by the time she was sued, had transitioned to private practice. *Id.*; *see* ROA.318-19; ROA.600-01.

---

[7] These were PUCT Commissioners Thomas Gleeson and Lori Cobos, along with Courtney Hjaltman, who was then head of the Office of Public Utility Counsel (and is now a PUCT Commissioner). *See* PURA §§ 39.151(g-1)(1), (6).

[8] ERCOT and the State Officers are thus not parties to this appeal.

9

GHAE also clarified that it was suing all the defendants exclusively in their official capacities. *See* ROA.250.

Appellees moved to dismiss GHAE's new and amended claims. ROA.501. GHAE responded, ROA.619, and after the district court heard oral arguments, *see* ROA.982, GHAE sought leave to file yet another amended complaint, ROA.773. GHAE's proposed Second Amended Complaint voluntarily dismissed GHAE's damages claims, as well as its equal-protection claims premised on allegations of race-, alienage-, and ethnicity-based discrimination (leaving only a national-origin theory). ROA.805-26; *see also* ROA.773-74. Appellees suggested that the district court grant GHAE leave to amend, apply their pending motion to dismiss to the amended pleading, and dismiss the case. ROA.915-16.

The district court agreed. It granted GHAE leave to amend and applied Appellees' motion to dismiss to GHAE's remaining claims. ROA.937 (citing *Rountree v. Dyson*, 892 F.3d 681, 683–84 (5th Cir. 2018)); *see* ROA.953 (Second Amended Complaint). The court granted Appellees' dismissal motion, ruling that LSIPA was not preempted by the CFIUS regime or the dormant foreign affairs preemption doctrine. ROA.938-50. The court also ruled that "GHAE does not have

a valid Equal Protection Clause claim." ROA.950.[9] Because these rulings were case-dispositive, the court did not address Appellees' alternative dismissal grounds. ROA.938 ("declin[ing] to address any purported procedural deficiencies in GHAE's SAC"). The district court rendered judgment dismissing GHAE's claims. ROA.976.

GHAE appealed. ROA.977. Notably, GHAE does not appeal the dismissal of its equal-protection claims or the dismissal of its preemption claim based on a theory of dormant-foreign-affairs preemption. Instead, GHAE challenges only the district court's rejection of its conflict- and field-preemption theories, both of which contend that LSIPA is preempted by the CFIUS regime.

---

[9] At the hearing on Appellees' motion to dismiss, "GHAE requested leave to amend its complaint to add allegations that [its] ultimate owner, Mr. Guangxin, 'has residences in the United States' or an 'immigration status' that would place him 'within the scope of the Constitution.'" ROA.950; *see* ROA.1023. Notably, GHAE's Second Amended Complaint "allege[d] none of these facts." ROA.950.

## SUMMARY OF THE ARGUMENT

To ensure that Texas's electric grid serves the particular needs of its citizens, Texas has spent decades guarding that grid from federal power. These efforts, which both this Court and the United States Supreme Court have repeatedly acknowledged, double-insulate utility regulation in Texas from federal control: "Utility regulation" is "traditionally associated with the police power of the States," *Just Energy*, 57 F.4th at 251 (cleaned up), and Texas has gone a step further by ensuring that the ERCOT grid and market are wholly *intra*state, *New York*, 535 U.S. at 7.

Because of its isolation, however, Texas's grid has unique vulnerabilities—against which Texas alone must guard. *See* State's Br. 5–6, 25–27. To that end, Texas enacted LSIPA, which (as relevant here) prohibits companies owned by Chinese citizens from controlling critical infrastructure connected to the Texas grid. Based on that law, ERCOT denied GHAE's request to interconnect a proposed solar project to the ERCOT grid.

GHAE asserts that ERCOT's decision was preempted by § 721 of the Defense Production Act, which gives the Committee on Foreign Investment in the United States authority—but no obligation—to review a narrow class of foreign-investment

12

Case: 25-50879    Document: 56    Page: 28    Date Filed: 04/24/2026

"covered transactions" involving *inter*state commerce for their effect on U.S. national security.

Section 721 contains no express preemption provision, and GHAE alleges no actual conflict between its terms and LSIPA. Instead, GHAE invokes the often-fuzzy doctrines of obstacle and field preemption, asserting that LSIPA frustrates what GHAE views as § 721's "calibrated" approach to foreign-investment review. But as this Court has made clear, obstacle preemption is not a license for courts to conduct freewheeling inquiries into whether a state law is in tension with federal objectives. Any conflict must, instead, be found in the federal statute's *text*. And because Texas acted within its historic police powers, GHAE must point to a "manifest intent" to preempt LSIPA.

GHAE's twice-amended pleadings failed to meet this bar. Section 721's text forecloses GHAE's claim, limiting CFIUS's jurisdiction to investments in businesses involved in *inter*state commerce (or, after 2020, certain real-estate transactions near military bases). Section 721 thus excludes the *intra*state interconnection application at issue here from that jurisdictional grant. GHAE cannot conjure from that limited and inapposite grant of jurisdiction an intent—let alone a *manifest* intent—to bar Texas from protecting the reliability and security of its intrastate electricity grid.

13

The district court correctly dismissed GHAE's preemption claims. And beyond these merits problems, GHAE's pleading suffered from numerous other fatal defects. This Court should affirm the district court's judgment.

## ARGUMENT

The district court dismissed GHAE's claims under Rule 12(b)(6). This Court reviews that order de novo, accepting as true all well-pleaded allegations of fact. *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007).

Appellee Holly Heinrich also sought relief under Rule 12(b)(1) and, in this Court, challenges GHAE's standing to sue her. ROA.310. As the party invoking federal jurisdiction, GHAE bore the burden to establish that subject-matter jurisdiction existed. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011). In ruling on a Rule 12(b)(1) motion, a court may consider, in addition to the complaint, "undisputed facts evidenced in the record." *Id.* (cleaned up).

## I.    The CFIUS regime is narrow and largely voluntary.

GHAE asserts that the statutory regime creating the Committee on Foreign Investment in the United States, or CFIUS, preempts LSIPA. But GHAE describes that regime only vaguely. Because the statutory text is key to assessing GHAE's preemption claims, Appellees will describe the regime and its text in more detail.

Under § 721 of the Defense Production Act of 1950, the President has authority to "investigat[e] and determine the effects on national security of mergers, acquisitions, and takeovers . . . by or with foreign persons which could result in foreign control of persons engaged in interstate commerce in the United States." Defense Production Act of 1950, Pub. L. 100-418, 102 Stat. 1107, § 5102. CFIUS was

initially created as a non-statutory interagency committee in 1975 to administer § 721. *See* Executive Order 11858 (May 7, 1975). In 2007, CFIUS became a permanent agency following passage of the Foreign Investment and National Security Act. Pub. L. No. 110-49, 121 Stat. 246; *see* 50 U.S.C. § 4565(k). Before 2018, CFIUS had jurisdiction only over a "merger, acquisition, or takeover . . . by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." 50 U.S.C. § 4565(a)(3) (amended 2018); *see, e.g.*, Pub. L. 110-49, § 2, 121 Stat. 246, 246–47.

GHAE relies heavily on the Foreign Investment Risk Review and Modernization Act ("FIRRMA") of 2018, which expanded CFIUS's jurisdiction. Pub. L. No. 115-232, § 1701-1728, 132 Stat. 1636. As amended by FIRRMA, § 721 is now codified at 50 U.S.C. § 4565. It limits CFIUS's jurisdiction to the review of "covered transactions." *Id.* § 4565(b)(1)(A). The term "covered transaction" includes *only*:

1. a "merger, acquisition, or takeover . . . that could result in foreign control of any United States business";

2. a purchase or lease of certain "real estate," particularly "in close proximity to [certain] United States Military installation[s]";

3. "other investment . . . by a foreign person in any unaffiliated United States business" engaged in certain activities; or

4. a "change in the rights that a foreign person has with respect to a United States business," "if that change could result in . . . foreign

16

> control of the United States business" or an investment describe in
> paragraph 2.

*Id.* § 4565(a)(4)(B)(i)–(iv).[10]

This language imposes several key jurisdictional limitations on CFIUS. To begin, FIRRMA's amendments apply only to a "covered transaction the review or investigation of which is initiated" after its 2018 enactment. Pub. L. No. 115-232, § 1727(a)(3), 132 Stat. 1636, 2206–07. The provisions granting CFIUS jurisdiction over real-estate transactions were delayed further still. *Id.* § 1727(b), 132 Stat. 1636, 2207; *see* ROA.944 ("CFIUS gained jurisdiction over real-estate transactions in February 2020 . . . ."). As Appellees explain below, no "covered transaction" is at issue in this case, let alone one as to which CFIUS initiated review after 2018. It is thus doubtful that FIRRMA has any application to this case. Nevertheless, Appellees address FIRRMA because GHAE's claims fail even under the amended statute.

Second, both before and after FIRRMA, CFIUS's non-real-estate jurisdiction has been limited to investments in a "United States business," i.e., a business "engaged in *interstate* commerce in the United States." 50 U.S.C. § 4565(a)(13) (emphasis added). Consequently, CFIUS lacks jurisdiction over investments in

---

[10] There is a fifth "covered transaction" that captures transactions that were purposefully designed or intended to evade CFIUS review. 50 U.S.C. § 4565(a)(4)(B)(v). GHAE does not plead or argue that provision's applicability.

businesses that are engaged only in *intra*state commerce. The ERCOT grid, of course, is entirely intrastate. *Just Energy*, 57 F.4th at 252.

Third, as the district court recognized, "the CFIUS statute covers only investments in *existing* U.S. businesses." ROA.943; *see* 50 U.S.C. §§ 4565(a)(4)(B)(i) ("merger, acquisition, or takeover"), (iii) ("in any unaffiliated United States Business"), (iv) ("change in the rights . . . with respect to a United States business"). CFIUS consequently has no jurisdiction over a foreign person's *creation of* a new business in the United States. This reality is expressly reflected in the Treasury regulations implementing § 721. *See* 31 C.F.R. § 800.301(e)(7) (providing that if a foreign person "incorporat[es] a newly formed subsidiary" and "construct[s] . . . a plant to make a new product," it "will not have acquired a U.S. business, and its greenfield investment is not a covered control transaction"). GHAE was formed in 2018 by its foreign parent. ROA.962.

Finally, CFIUS's real-estate jurisdiction under FIRRMA is defined by proximity to military bases and other sensitive federal installations. Pub. L. No. 115-232, § 1703, 132 Stat. 1636, 2177–78 (codified at 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(bb)).[11] Most land in Texas falls outside these confined areas,

---

[11] CFIUS also has real-estate jurisdiction over transactions related to property that "is located within, or will function as part of, an air or maritime port." 50 U.S.C. § 4565(a)(4)(B)(ii)(I)(aa).

and so even if this real-estate jurisdiction were at issue here it would only be because of the happenstance of geography.[12] *See* ROA.675.

Beyond these significant jurisdictional limitations, CFIUS's and the President's authority under § 721 is limited in other important ways. While CFIUS is permitted to unilaterally initiate review of a covered transaction, 50 U.S.C. § 4565(b)(1)(D), it almost never does so. Instead, as the district court explained, CFIUS review is, in practice, "essentially voluntary." ROA.928; *see* 50 U.S.C. § 4565(b)(1)(C) ("Any party or parties to any covered transaction may initiate a review of the transaction . . . .").[13] CFIUS's most recent annual report shows that it has not ordered unilateral review a single time in the last seven years. *See* CFIUS, *Annual Report to Congress–CY2024* at 5.[14] Parties thus file voluntary notices or

---

[12] As the district court explained, GHAE never pleaded that FIRRMA's real-estate provisions gave CFIUS jurisdiction over its application to interconnect the Blue Star Solar Project. ROA.944-45 n.6 (noting that GHAE failed to plead any facts supporting real-estate jurisdiction, despite several opportunities to do so); *see also infra* note 25 & surrounding text. In this Court, likewise, GHAE does not argue that CFIUS has jurisdiction over its interconnection application based on those provisions.

[13] Parties to a narrow set of covered transactions—primarily involving foreign-government control of certain U.S. businesses—are required to file a declaration. 50 U.S.C. § 4565(b)(1)(C).

[14] Available at https://perma.cc/W2YJ-J3Q8. CFIUS does attempt to identify what it calls "non-notified transactions"—transactions that are potentially within its jurisdiction, but with respect to which no declaration or notice is filed—and it occasionally asks the parties to those transactions to make a voluntary filing. *See* CFIUS, *Annual Report* at 40. For instance, out of the "thousands of potential non-notified transactions" that CFIUS identified in 2024, it "requested a filing for 12." *Id.*

declarations, which initiate the review process. If the transaction is cleared after a voluntary review, the party is protected from later unilateral action by CFIUS or the President. *See* 50 U.S.C. §§ 4565(b)(1)(D)–(E).

Section 721 empowers the President to "suspend or prohibit any covered transaction that threatens to impair the national security of the United States," but only if "the foreign interest exercising control might take action that threatens to impair the national security" *and* other provisions of law do not "provide adequate and appropriate authority for the President to protect the national security." *Id.* §§ 4565(d)(1), (4). Unsurprisingly, exercises of this authority are rare: it was used just once in 2024. *See* CFIUS, *Annual Report* at 32. More often—though still in a small minority of cases—reviews are concluded after the adoption of a mitigation agreement, or the imposition of conditions, to resolve national security concerns. *Id.* at 14 (noting that action was concluded in 16 cases after adoption of a mitigation agreement, and interim conditions were imposed in one case); *see* 50 U.S.C. § 4565(*l*)(3).

In sum, § 721 grants CFIUS jurisdiction over only a narrow class of "covered transactions"—a class that largely excludes intrastate commerce. And even within that jurisdictional grant, CFIUS operates primarily on a voluntary basis—reviewing

20

a tiny percentage of transactions potentially within its jurisdiction, and relying primarily on voluntary agreements to address security issues.

## II. The district court correctly dismissed GHAE's obstacle-preemption claim.[15]

### A. The conflict requiring preemption must be found in the federal statute's *text*.

This Court has recognized three categories of preemption: express, field, and conflict. *La Union del Pueblo Entero v. Abbott*, 151 F.4th 273, 290 (5th Cir. 2025). In arguing that § 721 preempts LSIPA,[16] GHAE relies primarily on conflict preemption. However, GHAE never alleges that it would be impossible to comply with both laws—and it obviously would not be. So GHAE relies, instead, on the "the variant [of conflict preemption] known as 'purposes and objectives' preemption," under which "a state law is preempted if it stands as an obstacle to fulfilling a federal law's full purposes and objectives." *Id.* (cleaned up).

Claims under this "purposes and objectives" doctrine "must clear a high threshold." *Id.* at 291 (cleaned up). This is because preemption must be found in the

---

[15] GHAE asserts only an as-applied challenge to LSIPA. *E.g.*, GHAE's Br. vi, 1, 2, 14, 25, 29; *see also* ROA.973-74.

[16] GHAE also pleaded that LSIPA was preempted by the International Emergency Economic Powers Act, as administered by the Office of Foreign Asset Control. ROA.960. As the district court concluded, however, GHAE abandoned that theory in response to Appellees' motion to dismiss, ROA.928, and it properly does not assert it in this Court.

statutory text, not a party's or court's subjective beliefs about what Congress intended: "Courts may not conduct a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives because such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Id.* (cleaned up). Instead, "evidence of pre-emptive purpose must be sought in the text and structure of the federal provision." *Zyla Life Sciences, LLC v. Wells Pharma of Hous., LLC*, 134 F.4th 326, 329 (5th Cir. 2025) (cleaned up); *La Union*, 151 F.4th at 295 ("If Congress's 'purposes and objectives' are to displace state law, those purposes and objectives must be gleaned from the text of a federal law enacted through the procedures demanded by the Constitution."); *Virginia Uranium, Inc. v. Warraen*, 587 U.S. 761, 777 (2019) (lead op. of Gorsuch, J., joined by Thomas and Kavanaugh, JJ.) (explaining that the obstacle preemption cannot "elevate abstract and unenacted legislative desires above state law").[17]

GHAE must also contend with the law's "presumption against preemption." *La Union*, 151 F.4th at 291. As the district court recognized, LSIPA operates within a zone of traditional state authority: regulation of electric utilities, which Texas has

---

[17] *See also Kansas v. Garcia*, 589 U.S. 191, 214 (2020) (Thomas, J., concurring, joined by Gorsuch, J.) (arguing that the "'purposes and objectives' pre-emption doctrine" is "contrary to the Supremacy Clause" because it "impermissibly rests on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law'" (cleaned up)).

uniquely and jealously guarded. ROA.926, ROA.941. When a state exercises its "historic police powers," this Court will find that exercise preempted "only if [the federal law] expresses Congress's clear and manifest purpose to do so." *La Union*, 151 F.4th at 291 (cleaned up); *accord Egelhoff v. Egelhoff*, 532 U.S. 141, 151 (2001) (holding that for the presumption to be overcome, Congress must have "made clear its desire for pre-emption").

## B.    There is no conflict between LSIPA and § 721's text.

To state a claim that LSIPA is preempted on obstacle grounds, GHAE was required to identify "evidence of pre-emptive purpose . . . in the text and structure" of § 721. *Zyla Life Sciences*, 134 F.4th at 329 (cleaned up). Consequently, GHAE cannot rely on its own subjective, motivated beliefs about § 721's purposes and objectives. Instead, any "purposes and objectives" that stand as a barrier to LSIPA's efficacy "must be gleaned from [§ 721's] *text*." *La Union*, 151 F.4th at 295 (emphasis added).

Tellingly, GHAE never acknowledges this framework, and it makes no effort to identify a preemptive purpose in § 721's text. The closest GHAE comes is a self-serving description of § 721 as a "calibrated" framework that "provides for individualized assessment, confidential interagency review, negotiated mitigation and monitoring, and—when warranted—presidential suspension or prohibition of a

23

covered transaction." GHAE's Br. 10. Utterly absent from even GHAE's description, however, is any textual evidence that Congress intended this regime to be *exclusive*.

Section 721 has no such language. If anything, its text points towards *non-exclusivity*. For instance, GHAE notes that the President can suspend or cancel a covered transaction. *Id.* But the President may use that authority *only* if other "provisions of law . . . do not . . . provide adequate and appropriate authority for the President to protect" national security. 50 U.S.C. § 4565(d)(4)(B). This is a clear contemplation that § 721 overlaps with other law, a point the statute makes even more explicit elsewhere: "No provision of this section shall be construed as altering or affecting any other authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law . . . ." *Id.* § 4565(i). Among the laws that § 721 expressly does not alter, therefore, are the Federal Power Act provisions recognizing that the *intra*state generation and transmission of electricity is generally outside federal jurisdiction and disclaiming any intent to preempt state grid regulations that are not inconsistent with federal reliability standards. 16 U.S.C. § 824(b)(1); 824o(i)(3);[18] *see also Great Atl. &*

---

[18] *See New York v. FERC*, 535 U.S. 1, 7 (2002) ("It is only in Hawaii and Alaska and on the 'Texas Interconnect'—which covers most of that State—that electricity is distributed entirely within a single State. In the rest of the country, any electricity that enters the grid

*Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) ("[U]nder our constitutional scheme the States retain broad power to legislate protection for their citizens in matters of local concern . . . ." (cleaned up)); *Public Serv. Comm'n of Utah v. United States*, 356 U.S. 421, 425 (1958) ("Intrastate transportation is primarily the concern of the State.").

GHAE also glosses over CFIUS's narrow jurisdictional grant, which likewise cuts strongly against its atextual assertions regarding § 721's purposes. This jurisdictional point was key to the district court's holding. The court held that CFIUS "does not have jurisdiction over intrastate activities," while the ERCOT grid "operates wholly within the state of Texas." ROA.940-41. This lack of jurisdictional overlap proved fatal to GHAE's obstacle-preemption claim: there is no conflict between LSIPA's regulation of who may access Texas's grid—an intrastate activity, in an area of traditional state power—and § 721, which disclaims any intent to regulate such activities. ROA.941.[19]

---

immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce.").

[19] GHAE asserts that because a business "may operate in multiple states and therefore be engaged in interstate commerce, while also engaging in intrastate activity within one or more States," the relevant jurisdictional inquiry is "whether the *business* is engaged in interstate commerce." GHAE's Br. 12. As the State points out, this mistakes the relevant inquiry. State's Br. 21–22. Anyway, GHAE did not plead that it was a "U.S. business," nor does it argue that it is one in this Court. Appellees' motions to dismiss that GHAE was *not* a "U.S. business" precisely because it had only alleged engagement in *intra*state

GHAE responds with the truism that "obstacle preemption does not ask whether Congress regulated every conceivable corner of a subject." GHAE's Br. 9. It is certainly true that Congress has the *power* to broadly preempt state regulation of an issue that Congress has itself regulated only narrowly. But it cannot simply be *assumed* from the existence of a narrow federal regime that Congress intended to exclude all state regulation of the subject, even as to matters the federal statute does *not* regulate. If anything, the contrary is true. *Cf. O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994) (holding that "matters left unaddressed in [a comprehensive federal statutory] scheme are presumably left subject to the disposition provided by state law"); *see also Wyeth v. Levine*, 555 U.S. 555, 602–03 (2009) (Thomas, J., concurring) (explaining *O'Melveny*'s relevance to obstacle preemption).

CFIUS's narrow jurisdiction also disposes of GHAE's assertion that allowing LSIPA to operate would "foreclos[e] federally contemplated outcomes (including conditional clearance and mitigation) and substitut[e] a different rule of decision." GHAE's Br. 11. There can be no "federally contemplated outcomes" regarding transactions that are not covered by § 721. But even if § 721 applied, the two laws

---

commerce. ROA.123, ROA.518. Despite amending its petition twice, GHAE never alleged that it engaged in interstate commerce, nor did it seek leave to do so. On the contrary, GHAE alleged it was formed in Texas as a greenfield investment to develop renewable projects on Texas land that would serve the intrastate ERCOT grid. ROA.962.

could easily operate in tandem, each addressing its particular area of concern. LSIPA does not displace CFIUS's powers or discretion, which could be exercised regardless of the Texas law's enactment.

However, the fact that a transaction is cleared by CFIUS is not license to actually engage in any particular transaction or business—let alone to do so free from state regulation. As GHAE now concedes, it merely means that the transaction may proceed, subject to state law. GHAE's Br. 11 (conceding that state "engineering standards, reliability rules, cybersecurity measures, and similar neutral regulations" apply to CFIUS-cleared transaction); *see* ROA.942 (ruling that clearance "merely insulates entities from further CFIUS review," but "does not give them the right to proceed with transactions without further federal or state regulatory review").[20] In requiring ERCOT to deny GHAE's application to interconnect to the intrastate Texas grid, LSIPA protects a uniquely state-law interest for which § 721 does not account, and it in no way interferes with CFIUS's work.[21]

---

[20] GHAE unfairly criticizes the district court for rejecting what it now calls "a strawman safe-harbor theory." GHAE's Br. 18–20. But GHAE's argument below was that § 721's so-called "safe harbor" provision "guaranteed" GHAE a "federal right to 'proceed' with its renewable energy projects in southwest Texas." ROA.636. The district court correctly rejected that argument, ROA.942, from which GHAE now runs.

[21] GHAE's assumption that LSIPA would not qualify as a neutral state-law rule is question-begging. It is also irrelevant that LSIPA acts as a "blanket ban" on transactions that fall within its scope. Every state law prohibiting conduct is a "blanket ban" on the proscribed conduct.

27

### C. GHAE cannot overcome the heavy presumption against preemption.

Beyond its failure to identify any textual basis for its obstacle-preemption claim, GHAE cannot overcome the law's heavy presumption *against* preemption. When a state exercises its "historic police powers," preemption will be found "only if [the federal law] expresses Congress's clear and manifest purpose to" preempt state law. *La Union*, 151 F.4th at 291 (cleaned up). The district court found that this presumption applied, explaining that "LSIPA merely controls who may access Texas's grid," and "Texas's regulation of its grid is an exercise of its historic police powers." ROA.941 (cleaned up).

GHAE points to no evidence of a "clear and manifest purpose" to preempt LSIPA. Instead, GHAE objects to the presumption's applicability. GHAE acknowledges that grid regulations that it subjectively believes to be appropriate would fall within Texas's historic police powers. GHAE's Br. 17 ("neutral interconnection standards, cybersecurity requirements, and operational rules applicable to all participants"). But GHAE asserts that because, in its opinion, LSIPA is not a "reliability rule," Texas was not acting within in its historic powers. *Id.*

Of course, LSIPA was enacted to ensure the grid's reliability. *See* State's Br. 5–6, 25–27. The district court explained that because the ERCOT grid is self-

28

contained, each individual generation resource "provides a larger fraction of the grid's total power than" is true in other regions. *Id.* (quoting *Texas*, 829 F.3d at 431). For the same reason, ERCOT cannot rely on out-of-state generation resources in the event that resources in Texas go offline. *Id.* Consequently, the loss of generation resources leaves Texas uniquely "'vulnerable to sudden power shortages.'" *Id.* (quoting *Texas*, 829 F.3d at 431). LSIPA was intended to protect Texas from these and other vulnerabilities.

LSIPA is also neutral, insofar as it is an "operational rule[] applicable to all participants." GHAE's Br. 17. The question of who may participate in its intrastate electricity market and grid is at the core of the State's historic police power. *See, e.g.*, *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 310, 321 n.6 (5th Cir. 2022) (acknowledging the unique power of the State of Texas to exclude non-incumbent transmission operators from the "intrastate ERCOT market"); *id.* at 329 (Elrod, J., concurring in part).[22] GHAE's problem is thus not with the area of regulation, but with the particular classification that LSIPA draws. Yet GHAE abandoned its equal-protection and dormant-commerce-clause claims because it could not prove that LSIPA's line-drawing exceeded constitutional bounds. And no preemption case

---

[22] In *Lake*, this Court reversed the dismissal of a dormant-commerce-clause challenge to a law excluding non-incumbent transmission operators from the Texas market—but it did so *only* as to the small regions of Texas that participate in *inter*state grids.

substantiates GHAE's belief that "nationality-based" classifications,[23] GHAE's Br. 17, automatically defeat the presumption against preemption. *See Shen v. Commissioner, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1262–66 (11th Cir. 2025) (rejecting § 721-based preemption challenge to Florida statute imposing land-ownership restrictions on certain aliens).

*American Insurance Association v. Garamendi*, on which GHAE principally relies, is not to the contrary. That case involved a state statute's "clear conflict" with an "express federal policy," which the Court held would suffice to defeat any presumption. 539 U.S. 396, 425 (2003). And while the Court expressed doubt that the state law in that case was really about state insurance law, *id.*, GHAE has raised no basis for doubting that Texas has a genuine concern for its grid's security.

LSIPA is doubly within the State's historic police powers: it regulates the utility-law question of who may connect to the Texas grid, and it does so with respect to a grid that is uniquely intrastate. The heavy presumption against preemption therefore applies, and GHAE fails to overcome it.

---

[23] As Appellees demonstrated below in response to GHAE's equal-protection claim, LSIPA does not draw any classification on the basis of national origin or alienage. *See* ROA.528.

### D.   *Crosby* does not support preemption here.

As it did below, GHAE relies heavily on *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000). But *Crosby* only illustrates the weakness of GHAE's preemption arguments.

At issue in *Crosby* was whether a Massachusetts law imposing economic sanctions on Burma was preempted by a federal sanctions law targeting that country. *Id.* at 367–68. Notably, the federal statute at issue in that case (1) imposed mandatory sanctions; (2) granted the President broad discretion regarding those sanctions, authorizing him to impose "further sanctions subject to certain conditions" *and* waive the mandatory sanctions; and (3) "direct[ed] the President to work to develop 'a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma.'" *Id.* at 368–69. Pursuant to that statute, the President issued an executive order imposing specific sanctions and ordering the Secretary of State to develop the strategy contemplated by the statute. *Id.* at 370.

The Court held that the Massachusetts law "undermine[d] the intended purpose and natural effect of" three specific provisions of the federal law. *Id.* at 373 (cleaned up). First, by imposing mandatory sanctions outside the President's authority, the Massachusetts law undermined Congress's express intent that the

31

President have "flexible and effective authority over economic sanctions against Burma." *Id.* Second, the state law "conflict[ed] with federal law . . . by penalizing individuals and conduct that Congress has *explicitly exempted or excluded* from sanctions." *Id.* at 378 (emphasis added). And third, Massachusetts's imposition of sanctions undermined Congress's explicit command that the President "speak for the United States among the world's nations in developing a 'comprehensive, multilateral strategy'" respecting Burma. *Id.* at 380. "Because the state Act's provisions conflict[ed] with Congress's specific" design, the Supreme Court found the Massachusetts law preempted. *Id.* at 388.

This case looks nothing like *Crosby*. GHAE identifies no actual "conflict[]" between § 721 and LSIPA. *Id.* And unlike the laws in *Crosby*, § 721 and LSIPA are not directed at the same subject: LSIPA regulates a zone of intrastate commerce that is squarely outside CFIUS's statutory jurisdiction. And unlike the Burma law, § 721 does not expressly grant the President or CFIUS "comprehensive" authority over anything. In short, the obstacle that required preemption in *Crosby* emanated directly from the federal statute's text. Here, by contrast, GHAE can point to nothing in § 721's text with which LSIPA interferes.

GHAE cannot avoid this analysis by chanting the word "calibrated." GHAE's Br. 10, 14–17, 19–20, 24. The Court used that term carefully, and in a specific sense:

32

Congress, the Court wrote, had "intended to limit economic pressure against the Burmese Government to a specific range," in a "deliberate effort to steer a middle path." 530 U.S. at 377–78 (cleaned up). The Massachusetts law "conflict[ed] with federal law" by mandating sanctions outside this "specific range," thus "undermin[ing] the congressional calibration of force." *Id.* at 378–80.

There is no similar calibration here. Section 721 grants the President broad discretion to suspend or cancel transactions—but only in a narrow jurisdictional category. And § 721 is silent regarding the security of the intrastate ERCOT grid or who may interconnect with it. No federal policy—let alone one located in § 721's plain language—is upset by the State's regulation of these local matters.

### E.    The Letter of Assurance is irrelevant to the preemption analysis.

In 2015, before GHAE had been created or FIRRMA enacted, non-parties Xinjiang and GH America Investment Group made a voluntary notice to CFIUS. *See* ROA.656, ROA.961.[24] The covered transaction apparently giving rise to this notice was GH America Investment Group's acquisition of assets belonging to several oil and gas companies. ROA.656; *see* 50 U.S.C. § 4565(a)(3) (amended 2018).

---

[24] FIRRMA's amendments to § 721 therefore do not apply to the voluntary notice or the LOA entered into under it. *See* Pub. L. 115-232, § 1727, 132 Stat 1636, 2207; *supra* § I.

33

That notification eventually resulted in the execution of a mitigation agreement called the Letter of Assurance. ROA.656 ("This LOA constitutes an agreement pursuant to Section 721(*l*) to mitigate such national security risk."); *see* ROA.961. The LOA required the signatories to notify the Department of Defense of certain contemplated "Asset Purchase[s]," to which DOD could object or not. ROA.657; *see* ROA.961.

Eventually, GHAE was created to develop certain renewable-energy projects, and it executed, along with the original LOA signatories, an amendment to the LOA. ROA.664; *see* ROA.961-62. That amendment expanded the definition of "Asset Purchase" to include "acquiring any interest in, or executing an agreement with respect to the operation of . . . any . . . wind, or other renewable energy project located within the United States." ROA.665; ROA.665 (requiring GHAE to provide DOD advance notice "identify[ing] the assets being acquired or operated").

The same amendment clarified *why* DOD was interested in these Asset Purchases: "[T]he operation of wind and other renewable energy sources *near military installations* may have potential impact on U.S. nationals security interests," and DOD wanted authority to limit construction, including "wind tower and utility infrastructure that may conflict with military activities or interfere with persistent surveillance of military training routes and installation and flight activities."

34

ROA.666 (emphasis added); *see also* ROA.962-64 (alleging that, with respect to a since-sold wind project, GHAE filed a notification "with the Military Aviation and Installation Assurance Siting Clearinghouse").[25]

As it did below, GHAE argues that this amended LOA gave CFIUS (via DOD) jurisdiction over the Blue Star Solar Project. GHAE's Br. 22–23. To begin, that assertion is doubtful. GHAE did not allege in the district court that its interconnection application constituted an "Asset Purchase" under the LOA, nor does it make such an argument in this Court. Indeed, GHAE did not even allege that it had solar assets related to the Blue Star Solar Project that could be operated. *See* ROA.961 (alleging that its projects are "to be constructed"). On the contrary, GHAE "concede[d]" below "that CFIUS has not approved the Blue Star Solar Project, nor has GHAE even submitted the project to CFIUS," ROA.942; *see* ROA.1020-22—as it would have been required to do if it were an "Asset Purchase."

More important, even if the LOA gave CFIUS voluntary, contract-based jurisdiction over the Blue Star Solar Project, that would not salvage GHAE's atextual

---

[25] While the LOA suggests that DOD/CFIUS are concerned about the siting of generation resources near an Air Force base, it is worth noting that GHAE did not plead, and it does not argue in this Court, that CFIUS's real-estate jurisdiction under FIRRMA is implicated by this case. The relevant land was purchased by non-party affiliates of GHAE in 2016 through 2018, before that real-estate jurisdiction took effect in 2020. ROA.961-62; *see supra* note 12.

preemption argument. As the district court noted, GHAE has "*never* allege[d] that the Blue Star Solar Project is a 'covered transaction' under" § 721, ROA.944 (emphasis added), and it relies instead solely on the amended LOA, GHAE's Br. 23. But as the district court pointed out, this would mean that the source of CFIUS's or the DOD's power to review the interconnection application at issue in this case is merely the product of a voluntary agreement. ROA.944-45.[26]

GHAE asserts that its voluntary agreement to give DOD authority over it is an example of the statute operating as intended. Even if that were right, it doesn't suffice to prove preemption—which must arise from statutory text, not private contract. *If* DOD/CFIUS have jurisdiction to review GHAE's interconnection application as a consequence of GHAE's voluntary execution of the LOA—and neither GHAE's pleading nor brief demonstrates that fact—that purely contingent fact cannot be the basis for finding that Texas's own regulation of that transaction is preempted by a statute that does not, itself, purport to cover it. ROA.944-45 ("Because preemption is determined by the language of the federal statute, it is immaterial that CFIUS has jurisdiction pursuant to an agreement between the

---

[26] GHAE also sought relief related to ERCOT's denial of its request to conduct a screening study for the purpose of making GHAE's assets more marketable. GHAE's Br. 6; ROA.968-69, .ROA.971-73. There is even less reason to believe that this transaction was covered by the LOA.

parties rather than the statute itself."). This is particularly true because the LOA was concerned with an issue—the siting of utility assets near military bases—that does not overlap with the grid-security concerns underlying LSIPA.

GHAE's LOA-based preemption arguments thus fail.

## III.  GHAE failed to adequately allege field preemption.

GHAE also relies on field preemption. To prevail, GHAE must show that "Congress, acting within its proper authority, has determined" that the relevant field is one that "must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). But as with obstacle preemption, the applicability of this doctrine is a question of Congressional intent that must be answered using statutory text. *AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026) ("Field preemption is fundamentally a question of congressional intent." (cleaned up)); *see Virginia Uranium*, 587 U.S. at 767 (lead op. of Gorsuch, J.) (explaining that "one feature unites" every preemption doctrine: the primacy of text over "brooding federal interest[s] or appeal[s]to a judicial policy preference"). Thus, courts "hesitate to infer field preemption absent a showing of complete ouster of state power." *Murrill*, 166 F.4th at 539; *see Kansas*, 589 U.S. at 214 n.* (Thomas, J., concurring, joined by Gorsuch, J.) (expressing "skeptic[ism] of field pre-emption, at

least as applied in the absence of a congressional command that a particular field be preempted" (cleaned up)).

In the first place, GHAE fails to properly identify the relevant field. In evaluating a field-preemption argument, it is critical to "consider[] the *target* at which the state law *aims*." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015). This Court, moreover, demands that "the relevant field should be defined narrowly." *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018).

GHAE contends that § 721 occupies the field of "foreign-actor national-security screening and gatekeeping." GHAE's Br. 26. GHAE's overly broad, self-serving definition elides § 721's primary focus on foreign-*investment* screening over only "covered transactions." LSIPA, by contrast, is not a foreign-investment-screening mechanism, nor does it screen for U.S. national security issues. Instead, as applied here, LSIPA's narrow focus is on protecting critical infrastructure in Texas, especially its intrastate electric grid. Standing alone, this mis-match defeats GHAE's claim. *See Kansas*, 589 U.S. at 208 (rejecting field-preemption argument because the federal and state laws "serve[d] entirely different functions"); *see also Oneok*, 575 U.S. at 385 (emphasizing "the significant distinction for purposes of pre-emption in the natural-gas context . . . between measures" targeting *intra*state commerce and those "aimed directly at interstate" commerce (cleaned up)).

38

However, even if GHAE properly identified the relevant field, its claim would fail for several additional reasons. Most crucially, GHAE identifies no statutory text supporting its field-preemption arguments. GHAE merely asserts that § 721 "is 'pervasive' in the sense relevant to field preemption" because it grants authority to "a single nationally accountable mechanism rather than fifty separate state regimes." GHAE's Br. 27. But that is true almost any time Congress grants power to an administrative agency—yet few such grants are field preemptive.

It is thus unsurprising that GHAE's own authorities betray it. GHAE quotes *Hines*'s statement that field preemption may exist "where Congress adopts a 'single integrated and all-embracing system.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)).[27] But as Appellees have shown, and the district court held, § 721 is not remotely "all-embracing": it regulates only a narrow class of "covered

---

[27] Both *Hines* and *Arizona v. United States*, on which GHAE also relies, recognized that Congress had "occupied the field of alien registration," leaving "no room for States to regulate" in that narrow field. *Arizona*, 567 U.S. 387, 400–01 (2012). But that system is far more comprehensive than § 721, providing a system universally applicable to all aliens in the United States. *See id.* As important, the Supreme Court has repeatedly emphasized the narrow breadth of those decisions' field-preemption holdings. *See, e.g., id.* at 401 (striking down only one provision of the state's law on field-preemption grounds); *Chamber of Com. v. Whiting* 563 U.S. 582, 604 (2011) (upholding state law that allowed the suspension and revocation of licenses of businesses that employed undocumented aliens); *DeCanas v. Bica*, 424 U.S. 351, 358 (1976) (upholding state law outlawing employment of undocumented aliens), *superseded by statute as recognized by Kansas*, 589 U.S. at 196–97; *see also United States v. Texas*, 144 F.4th 632, 724 (5th Cir. 2025) (Oldham, J., dissenting) (discussing these cases and observing that "[t]here is no field preemption of all of immigration law"), *rehearing en banc granted*, 150 F.4th 656 (5th Cir. 2025).

transactions," and does so on a mostly voluntary basis. Nowhere in § 721's text is any indication that Congress intended a "complete ouster of state power." *Murrill*, 166 F.4th at 539; *see also* 50 U.S.C. § 4565(i) (disclaiming any intent to affect "any other authority, process, [or] regulation" established by federal law). The district court correctly dismissed GHAE's field-preemption argument on this ground. ROA.946 (concluding that "nothing in the CFIUS statutes suggests an intent to create a pervasive regulatory scheme").

Further, even if § 721 were deemed to be pervasive as to the transactions over which it grants CFIUS jurisdiction, there would still be no basis for finding preemption as applied to GHAE's request to interconnect its proposed Blue Star Solar Project with the ERCOT grid. When Congress leaves matters "unaddressed in an otherwise comprehensive and detailed federal regulatory scheme," the unregulated matters "are presumably left subject to the disposition provided by state law." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025) (cleaned up). Thus, Congress's decision to exclude *intra*state commerce from the definition of "U.S. business," thereby carving it out from the scope of non-real-estate "covered transactions," indicates an intent to leave such regulation to the States—to which it has traditionally belonged. *Id.* (holding that because "Congress chose not to regulate

40

distribution to patients," even as it closely regulated related issues, "indicat[ed] that it did not intend to occupy the entire field in this area").

Finally, this Court has "recently reiterated that courts should not infer field preemption in areas that have been traditionally occupied by the states, in which case congressional intent to preempt must be clear and manifest." *Id.* at 647 (cleaned up). As applied here, LSIPA regulates a distinctly state-law question: who may interconnect with the Texas grid (a question of utility law), which operates only within the borders of Texas (and is thus a question of intrastate commerce). Yet GHAE does not even try to identify in § 721 a "clear and manifest" intent to preempt LSIPA.

The district court correctly dismissed GHAE's field-preemption claim.[28]

## IV.    GHAE's preemption claims suffer from several other fatal defects.

GHAE pleaded its preemption claim under both § 1983 and *Ex Parte Young*. While GHAE seeks a judgment "instruct[ing]" the district court "to deny the motion to dismiss," GHAE's Br. 30, GHAE never specifies which of these causes of action it believes it has properly pleaded.

---

[28] In the district court, GHAE also relied on the dormant foreign affairs preemption doctrine. ROA.641-42. The district court rejected that argument. ROA.946-48. GHAE does not raise, and has thus forfeited, that argument in this Court.

Hiding behind GHAE's silence are numerous other defects that provide a basis for affirming the district court's judgment.

### A.    GHAE failed to plead an *Ex Parte Young* cause of action.

#### 1.    Congress foreclosed private enforcement of § 721.

The text and structure of § 721 demonstrate that Congress foreclosed private enforcement under *Ex Parte Young*.

A court's equitable power to enjoin government action under *Ex Parte Young* "is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Therefore, the Court "must ask if Congress has 'displaced' by statute 'the equitable relief that is traditionally available.'" *Garcia Morin v. Bondi*, 152 F.4th 626, 634 (5th Cir. 2025) (quoting *Armstrong*, 575 U.S. at 329 (cleaned up)). If the statutory text and structure reflect "Congress's intent to foreclose equitable relief," then the Court may not entertain an equitable claim under *Ex Parte Young*. *Armstrong*, 575 U.S. at 326–28 (cleaned up).

In *Armstrong*, the Supreme Court focused on "[t]wo aspects" of a provision of the Medicaid Act that foreclosed a private party from asserting a claim that a state law was preempted by the Act. First, Congress authorized the withholding of funds by the Secretary of HHS as punishment for a violation of the Act. *Id.* at 328. Congress's creation of an express remedy for a State's failure to comply with the Act, the Court held, implied "that Congress intended to preclude other[]"

42

enforcement mechanisms, such as private suits in equity. *Id.* at 328 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

Second, while the express remedy alone may have been sufficient to conclude that Congress had foreclosed equitable relief, Congress's intent to do so was underscored by "the judicially unadministrable nature" of the text that the private plaintiff sought to enforce. *Id.* The relevant provision required States to make payments that were "consistent with efficiency, economy, and quality of care," while "safeguard[ing] against unnecessary utilization of such care and services." *Id.* (cleaned up). "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone," the Court held, established that the statute "precludes private enforcement" of the relevant provision "in the courts." *Id.*

Courts applying *Armstrong* have concluded that several statutory schemes reflect Congress's intent to foreclose equitable relief. For example:

- Equitable claims seeking to enforce the Controlled Substances Act. That Act "expressly delegate[s]" enforcement to the Attorney General, who has "almost complete discretion . . . whether to assert the supremacy of federal law" vis-à-vis "arguably conflicting" state regimes. *See Smith v. Hickenlooper*, 164 F. Supp.3d 1286, 1292–93 (D. Colo. 2016);[29] *Alliance v. Alternative Holistic Healing, LLC*, No. 1:15-cv-349-REB-CBS, 2016 WL 223815 (D. Colo. Jan. 19, 2016).

---

[29] Although the Tenth Circuit affirmed *Smith*, it did so on alternative grounds—namely, that the CSA did not create a federal right. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 903 (10th Cir. 2017). Appellees acknowledge that the Tenth Circuit's reasoning is

- Equitable claims under the Federal Power Act. Courts have recognized that the "FPA tacitly forecloses private parties from invoking equity jurisdiction to challenge state laws enacted in alleged violation of the FPA because Congress implicitly provided a 'sole remedy' in the FPA—specifically, enforcement by FERC." *Coalition for Competitive Elec. v. Zibelman*, 272 F. Supp.3d 554, 565 (S.D.N.Y. 2017),[30] *aff'd on other grounds*, 906 F.3d 41 (2d Cir. 2018). Additionally, the FPA provides "a narrow private cause of action"—thus foreclosing a different, broader one. *Id.* And it is "judicially unadministrable" because it would require the court to draw non-textual lines between permissible and impermissible state regulation. *Village of Old Mill Creek v. Star*, No. 17-cv-1163, 2017 WL 3008289, at *9 (N.D. Ill. July 14, 2017), *aff'd on other grounds sub nom.*, *Electric Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018).

- Equitable claims under the Surface Transportation Assistance Act. This Act "bar[s] private parties from enforcing" it because it commits enforcement authority to the Attorney General. *Scannell Properties #516, LLC v. City of Edwardsville*, No. 24-2604, 2025 WL 1769310, at *10 (D. Kan. June 26, 2025), who thus has discretion regarding "when enforcement should be sought," *Thomas v. City of Port Arthur*, No. 1:23-cv-282, 2025 WL 904395, at *19 (E.D. Tex. Mar. 25, 2025). This is despite the act being judicially administrable. *Id.*

For similar reasons, the Defense Production Act and § 721 demonstrate a congressional intent to foreclose equitable relief through private enforcement.

---

contrary to the law in this Circuit. *See Crown Castle Fiber, LLC v. City of Pasadena*, 76 F.4th 425, 434–35 (5th Cir. 2023). But Appellees' arguments track those of the district court (and thus the Supreme Court in *Armstrong*).

[30] *Accord Pastoriza v. Pub. Serv. Co. of N.H.*, No. 24-cv-252, 2025 WL 662935, at *2 (D.N.H. Feb. 28, 2025); *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp.3d 943, 956-57 (S.D. Ind. 2019).

First, Congress gave enforcement authority to the President alone. The DPA, of which § 721 is part,[31] empowers the President to seek injunctive relief "[w]henever in [*his*] *judgment* . . . any person has engaged or is about to engage in" conduct violating § 721. 50 U.S.C. § 4556(a) (emphasis added). This includes the power to seek injunctive relief against states. *Id.* § 4552(15) (defining "person" to include "any State or local government or agency thereof"). Consequently, "[*a*]*ll* litigation arising under [§ 721] . . . *shall* be under the supervision and control of the Attorney General." *Id.* § 4556(b) (emphasis added).

These provisions "limit the enforcement of" the DPA, including § 721, "to the President and those to whom he duly delegated his powers." *Acorn Iron & Supply Co. v. Bethlehem Steel Co.*, 96 F. Supp. 481, 482 (E.D. Pa. 1951). Congress's "express provision of one method of enforcing" § 721 "suggests that Congress intended to preclude others," including suits under *Ex Parte Young*. *Armstrong*, 575 U.S. at 328 (quoting *Sandoval*, 532 U.S. at 290).

Second, this enforcement authority is vested in *the President*, creating "a system of centralized enforcement," *Smith*, 164 F. Supp.3d at 1292–93, that is as uniform as it gets in the Executive Branch, *see Seila Law LLC v. CFPB*, 591 U.S. 197,

---

[31] In the district court, GHAE argued that § 4556 does not apply to § 721. ROA.457. In fact, § 4556 refers to "violation[s] of" and "litigation arising under this chapter," i.e., chapter 55 of Title 50. Section 721 is part of chapter 55. *See* ROA.711.

203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President . . . .'").

Third, the President possesses broad discretion in determining whether a person's conduct violates § 721, and thus when injunctive relief ought to be sought against such a violation. *See* 50 U.S.C. § 4556(a) ("Whenever *in the judgment of the President* any person has engaged in or is about to engage in any acts or practices which would or will constitute a violation of any provision of this chapter, he may make an application to the appropriate court for an order enjoining such acts or practices . . . . (emphasis added)). This grant of explicit presidential discretion would be severely diminished were private parties allowed to seek injunctive relief based on what they—not the President—believe to be violations of § 721. *See Smith*, 164 F. Supp.3d at 1293 ("Allowing private litigants to interfere with that discretionary decision would create precisely the type of 'risk of inconsistent interpretations and misincentives' which strongly counsel against recognizing an implicit right to a judicially created equitable remedy." (cleaned up)).

Fourth, § 721 "provide[s] for a narrow private cause of action." *Coalition for Competitive Elec.*, 272 F. Supp.3d at 565. While presidential findings and action under § 721 are not "subject to judicial review," a party may file a "civil action challenging" other "action[s] or finding[s]" directly in the D.C. Circuit. 50 U.S.C.

46

§§ 4565(e)(1)–(2). The creation of this narrowly circumscribed cause of action suggests that Congress made an "intentional" decision not to permit a broader "private right of action." *Coalition for Competitive Elec.*, 272 F. Supp.3d at 565 (cleaned up).

Finally, the nature of GHAE's preemption claim makes it "judicially unadministrable." GHAE acknowledges that the State may regulate it, GHAE's Br. 45–46, but contends that *this* regulation is "too much," *Village of Old Mill Creek*, 2017 WL 3008289, at *9. Thus, the relief sought by GHAE would require the "court to draw some lines, to give the state direction on how not to interfere with" federal prerogatives "while acting within its undisputed authority to regulate." *Id.* That analysis "treads on" the President's explicit power to decide, in his own personal judgment, when § 721 ought to be enforced via injunction. *Id.*

In sum, the text and structure of the CFIUS statutory regime demonstrates that Congress has foreclosed GHAE's *Ex Parte Young* claims for equitable relief. This is an independent ground for affirming the district court's dismissal of those claims.

### 2.    GHAE failed to sue a proper defendant.

In *Freedom From Religion Foundation, Inc. v. Mack*, a panel of this Court held that *Ex Parte Young* did not provide a cause of action for a suit against a *county* rather

47

than *state* official. 4 F.4th 306, 311–12 & nn.3–4 (5th Cir. 2021), *vacated in part without regard to the merits*, 49 F.4th 941 (5th Cir. 2022). The reason is that the *Ex Parte Young* cause of action and its immunity waiver are inextricably intertwined, and there is thus no need for a special equitable cause of action when a suit is asserted against a party without the immunity necessitating the claim's recognition. *See id.* at 312 & n.5; *see also United States v. Texas*, 97 F.4th 268, 311–12 (5th Cir. 2024) (Oldham, J., dissenting). While *Mack*'s holding was later vacated without regard to its merits, 49 F.4th at 948 n.4,[32] it remains persuasive.

Like the county in *Mack*, this Court has held that ERCOT does not have Eleventh Amendment immunity. *Entrust*, 101 F.4th at 369. As in *Mack*, its officials are therefore not amenable to *Ex Parte Young* claims. 4 F.4th at 312. This is another alternative ground for dismissing GHAE's *Ex Parte Young* claims.

### B.    GHAE failed to adequately plead a § 1983 claim.

#### 1.    GHAE failed to identify any federal right that could support its § 1983 claim.

To state a § 1983 claim, a plaintiff must allege deprivation of a "right[], privilege[], or immunit[y] secured by the Constitution" or federal law. 42 U.S.C. § 1983. But the Supremacy Clause, standing alone, "is not the source of any federal

---

[32] The *Mack* merits panel vacated the motion panel's discussion of the plaintiff's official-capacity claim because the district court's order on that claim had not been appealed.

48

rights," *Armstrong*, 575 U.S. at 324–25 (cleaned up), and it therefore cannot provide the basis for a § 1983 claim, *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107–08 (1989) ("[I]t would obviously be incorrect to assume that a federal right of action pursuant to § 1983 exists every time a federal rule of law pre-empts state regulatory authority.").

However, despite Appellees raising this argument before GHAE filed its live pleading, *see* ROA.511, GHAE pleaded only deprivation of the "rights, privileges, or immunities secured by the Supremacy Clause," ROA.973. Its § 1983 claim thus fails. *Golden State*, 493 U.S. at 107–08.[33]

### 2.    GHAE failed to adequately plead a *Monell* claim.

Because Appellees were sued only in their official capacities, GHAE's claims amount to claims against ERCOT itself. *Hafer v. Melo*, 502 U.S. 21, 26–27 (1991). Because GHAE seeks to hold ERCOT the entity liable, it was required to allege liability under *Monell*. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *accord Los Angeles County v. Humphries*, 562 U.S. 29, 37 (2010).

---

[33] *Golden State* recognized that the federal law underlying a preemption claim might "create a federal right for which § 1983 provides a remedy." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989). But GHAE pleaded no such statutory right. ROA.973; *see also* ROA.711.

49

In the district court, GHAE asserted that *Monell* did not apply. First, GHAE argued that ERCOT was "not a municipality" and was instead "an arm of the State of Texas." ROA.650. But *Monell* is not limited to municipalities: it applies to any § 1983 suit seeking relief against an entity, including an entity that is an arm of the State under Texas law. *See, e.g.*, *Martinez v. Nueces County*, 71 F.4th 385, 391 (5th Cir. 2023) (holding that *Monell* applied to suit against a county, which is an arm of the State for purposes of Texas law); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (collecting cases applying *Monell* to corporations). Second, GHAE asserted that *Monell* does not apply to injunction claims. ROA.650. This argument, for which GHAE cited no authority, is mistaken.[34] *See, e.g.*, *Daves v. Dallas County*, 22 F.4th 522, 532–34 (5th Cir. 2022) (en banc) (applying *Monell* to injunction claims); *see also Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("*Monell* draws no distinction between injunctive and other forms of relief.").

Beyond these challenges to the doctrine's application, GHAE did not dispute that it failed to plead a valid *Monell* claim. GHAE had to "identify: (1) an official

---

[34] GHAE may have been conflating Appellees' *Monell* argument with their distinct argument that GHAE's § 1983 damages claims failed because Appellees were acting on behalf of the State and were therefore not § 1983 "persons" for the purposes of those claims. ROA.525-26 (citing *Daves v. Dallas County*, 22 F.4th 522, 532–33 (5th Cir. 2022) (en banc)). Appellees readily conceded this argument did not apply to GHAE's injunction claims. ROA.717. And because GHAE voluntarily dismissed its damages claim, that argument is not before this Court.

policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (cleaned up). Further, because an official-capacity claim "may be brought *only* against an official acting as a policymaker," the pleadings and law must establish that each Appellee was a policymaker with respect to the policy responsible for GHAE's alleged injuries. *Guillot v. Russell*, 59 F.4th 743, 750–51 (5th Cir. 2023) (emphasis added); *Arnone v. Dallas County*, 29 F.4th 262, 265–66 (5th Cir. 2022).

GHAE did not specifically plead the policy underlying its *Monell* claim, but LSIPA itself provides the only possibility. ROA.967-69; *see* ROA.523. However, despite Appellees raising these arguments with respect to both GHAE's Original and First Amended Complaint, ROA.133-35; ROA.521-23, GHAE failed to plead that *any* Appellee was a policymaker with respect to LSIPA. For this reason alone, GHAE's § 1983 claims failed. *Guillot*, 59 F.4th at 750–51; *Arnone*, 29 F.4th at 265–66.

Indeed, GHAE's pleading affirmatively defeats its § 1983 claims. GHAE pleaded that, in denying its interconnection requests, Appellees were complying with mandatory state law. ROA.966-69. Under this Court's binding precedent, however, compliance with mandatory state law cannot be the basis for a *Monell* claim.

51

*E.g.*, *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1215 n.31 (5th Cir. 1991) (holding that county was not "susceptible to liability under § 1983" where the relevant policymaker had only "effectuated a policy of the State of Texas"); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (holding that a county official's enforcement of state law "may more fairly be characterized as the effectuation of the policy of the State," for which reason county was "not susceptible to liability under section 1983").

GHAE's failure to plead a valid *Monell* claim, despite three opportunities, is an independent ground for affirming the district court's dismissal of GHAE's § 1983 claims.

## C.    GHAE lacks standing to sue Ms. Heinrich.

In its First Amended Complaint, GHAE added a complaint against Ms. Heinrich in her purported official capacity as "Legal/Regulatory Counsel of ERCOT." ROA.250; *see also* ROA.954. But Ms. Heinrich ceased to be an employee of ERCOT more than two months *before* GHAE sued her. *See* ROA.509; ROA.601.[35]

Because Ms. Heinrich was not an ERCOT employee at the time GHAE brought a claim against her, she had no official capacity in which she could be sued.

---

[35] GHAE's only response to Ms. Heinrich's argument was that the district court could not rely on her declaration. ROA.638. But Ms. Heinrich properly relied on that document in support of her Rule 12(b)(1) motion. *See* ROA.717.

*See Enders v. Boone*, 658 F. Supp.3d 70, 93 (N.D.N.Y. 2023) (dismissing purported official-capacity defendants who were sued *after* they left office); *Michalik v. Herman*, No. 99-3496, 2001 WL 434489, at *2 (E.D. La. Apr. 26, 2001) ("Case law provides that a person cannot be sued in his capacity as an official if he does not hold the office in question when suit is filed.").

This defect goes to GHAE's standing to sue Ms. Heinrich. GHAE seeks only prospective relief—and seeks it against ERCOT the entity, via official-capacity suits against ERCOT's officers. However, by the time GHAE sued Ms. Heinrich, she was no longer an ERCOT official, and she therefore did not "h[o]ld the authority" necessary to redress GHAE's alleged injuries. *Enders*, 658 F. Supp.3d at 93. GHAE's claims against Ms. Heinrich therefore fail the redressability prong of the standing inquiry.

Rather than drop its needless suit against Ms. Heinrich, then and now a lawyer in private practice, GHAE asserted that Ms. Heinrich's successor was automatically substituted as a defendant under Federal Rule of Civil Procedure 25. *See* ROA.510. This is wrong. Rule 25 only provides for automatic substitution of an official-capacity defendant "*who is a party*" if she "resigns . . . *while the action is pending*." Fed. R. Civ. P. 25(d) (emphasis added).

But Ms. Heinrich was not a party when she resigned, and Rule 25 is, by its plain language, inapplicable. *See Massachusetts Hosp. Ass'n v. Harris*, 500 F. Supp. 1270, 1283 (D. Mass. 1980) (dismissing official-capacity defendants, and rejecting Rule 25(d)'s application, where defendants were first named after leaving office); *see also Washington v. Baltimore Police Dep't*, 457 F. Supp.3d 520, 544 (D. Md. 2020) (holding that similar language in Rule 25(a)(1) restricts the Rule's application to a person who had *already* been made a party to the action *before* the event purportedly requiring substitution); *Michalik*, 2001 WL 434489, at *3. Rule 25 therefore cannot solve GHAE's standing problem.

## Conclusion

The district court correctly held that GHAE failed to state a valid conflict- or field-preemption claim, and GHAE's claims fail for several additional reasons as well. Appellees pray that this Court affirm the district court's judgment.

Respectfully submitted,

*s/ Wallace B. Jefferson*

John D. Ramer
DC Bar No. 90002236
jramer@cooperkirk.com
David H. Thompson
DC Bar No. 450503
dthompson@cooperkirk.com
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Facsimile:  (202) 220-9601

Wallace B. Jefferson
Texas Bar No. 00000019
wjefferson@adjtlaw.com
Nicholas Bacarisse
Texas Bar No. 24073872
nbacarisse@adjtlaw.com
Alexander Dubose &
  Jefferson LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300
Facsimile:   (512) 482-9303

Elliot Clark
Texas Bar No. 24012428
eclark@winstead.com
Winstead PC
600 W. 5th Street, Suite 900
Austin, Texas 78701
Telephone: (512) 370-2849
Facsimile:  (512) 370-2850

**Attorneys for Defendants-Appellees**

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of April, 2026, this Brief of Appellees was electronically filed with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Wallace B. Jefferson*
Wallace B. Jefferson

**CERTIFICATE OF COMPLIANCE**

I certify that:

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), it contains 12,369 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared in Microsoft Office Word in 14-point font, Equity A font, except for footnotes, which are in 12-point font as permitted by Fifth Circuit Rule 32.1.

*s/ Wallace B. Jefferson*
Wallace B. Jefferson